BOOTH *v.* MARYLAND

No. 86–5020.   Argued March 24, 1987—Decided June 15, 1987

POWELL, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined, *post,* p. 515. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and WHITE and O'CONNOR, JJ., joined, *post,* p. 519.

*George E. Burns, Jr.,* argued the cause for petitioner. With him on the brief were *Alan H. Murrell* and *Julia Doyle Bernhardt.*

*Charles O. Monk II,* Deputy Attorney General of Maryland, argued the cause for respondent. With him on the brief were *J. Joseph Curran, Jr.,* Attorney General, and *Valerie V. Cloutier,* Assistant Attorney General.*

JUSTICE POWELL delivered the opinion of the Court.

The question presented is whether the Constitution prohibits a jury from considering a "victim impact statement" during the sentencing phase of a capital murder trial.

## I

In 1983, Irvin Bronstein, 78, and his wife Rose, 75, were robbed and murdered in their West Baltimore home. The murderers, John Booth and Willie Reid, entered the victims'

---

*Julius L. Chambers, James M. Nabrit III, John Charles Boger, Vivian Berger,* and *Anthony G. Amsterdam* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

*Louis J. DiTrani* filed a brief for the Stephanie Roper Foundation, Inc., as *amicus curiae* urging affirmance.

home for the apparent purpose of stealing money to buy heroin. Booth, a neighbor of the Bronsteins, knew that the elderly couple could identify him. The victims were bound and gagged, and then stabbed repeatedly in the chest with a kitchen knife. The bodies were discovered two days later by the Bronsteins' son.

A jury found Booth guilty of two counts of first-degree murder, two counts of robbery, and conspiracy to commit robbery.[1] The prosecution requested the death penalty, and Booth elected to have his sentence determined by the jury instead of the judge. See Md. Ann. Code, Art. 27, § 413(b) (1982). Before the sentencing phase began, the State Division of Parole and Probation (DPP) compiled a presentence report that described Booth's background, education and employment history, and criminal record. Under a Maryland statute, the presentence report in all felony cases[2] also must include a victim impact statement (VIS), describing the effect of the crime on the victim and his family. Md. Ann. Code, Art. 41, § 4–609(c) (1986). Specifically, the report shall:

"(i) Identify the victim of the offense;

"(ii) Itemize any economic loss suffered by the victim as a result of the offense;

---

[1] Booth's accomplice, Willie Reid, was convicted and sentenced to death as a principal in the first degree to the murder of Mrs. Bronstein. His conviction was affirmed and his sentence is currently under review. See *Reid* v. *State*, 305 Md. 9, 501 A. 2d 436 (1985).

[2] When the statute was enacted it was unclear whether a VIS was admissible in a capital case. See § 4–609(c)(2)(i) (1986) (VIS required if victim suffered *injury*, whereas for a misdemeanor, VIS required if victim suffers injury *or death*); *Lodowski* v. *State*, 302 Md. 691, 761, 490 A. 2d 1228, 1264 (1985) (Cole, J., concurring), vacated on other grounds, 475 U. S. 1078 (1986). In 1983, the Maryland General Assembly amended the VIS provision to provide that:

"In any case in which the death penalty is requested . . . a presentence investigation, including a victim impact statement, shall be completed by the Division of Parole and Probation, and shall be considered by the court or jury before whom the separate sentencing proceeding is conducted . . . ." § 4–609(d) (1986).

"(iii) Identify any physical injury suffered by the victim as a result of the offense along with its seriousness and permanence;

"(iv) Describe any change in the victim's personal welfare or familial relationships as a result of the offense;

"(v) Identity any request for psychological services initiated by the victim or the victim's family as a result of the offense; and

"(vi) Contain any other information related to the impact of the offense upon the victim or the victim's family that the trial court requires." § 4–609(c)(3).

Although the VIS is compiled by the DPP, the information is supplied by the victim or the victim's family. See §§ 4–609(c)(4), (d). The VIS may be read to the jury during the sentencing phase, or the family members may be called to testify as to the information.

The VIS in Booth's case was based on interviews with the Bronsteins' son, daughter, son-in-law, and granddaughter. Many of their comments emphasized the victims' outstanding personal qualities, and noted how deeply the Bronsteins would be missed.[3] Other parts of the VIS described the emotional and personal problems the family members have faced as a result of the crimes. The son, for example, said

---

[3] The VIS stated:

"[T]he victims' son reports that his parents had been married for fifty-three years and enjoyed a very close relationship, spending each day together. He states that his father had worked hard all his life and had been retired for eight years. He describes his mother as a woman who was young at heart and never seemed like an old lady. She taught herself to play bridge when she was in her seventies. The victims' son relates that his parents were amazing people who attended the senior citizens' center and made many devout friends." App. 59.

"As described by their family members, the Bronsteins were loving parents and grandparents whose family was most important to them. Their funeral was the largest in the history of the Levinson Funeral Home and the family received over one thousand sympathy cards, some from total strangers." Id., at 63.

that he suffers from lack of sleep and depression, and is "fearful for the first time in his life." App. 61. He said that in his opinion, his parents were "butchered like animals." *Ibid.* The daughter said she also suffers from lack of sleep, and that since the murders she has become withdrawn and distrustful. She stated that she can no longer watch violent movies or look at kitchen knives without being reminded of the murders. The daughter concluded that she could not forgive the murderer, and that such a person could "[n]ever be rehabilitated." *Id.*, at 62. Finally, the granddaughter described how the deaths had ruined the wedding of another close family member that took place a few days after the bodies were discovered. Both the ceremony and the reception were sad affairs, and instead of leaving for her honeymoon, the bride attended the victims' funeral. The VIS also noted that the granddaughter had received counseling for several months after the incident, but eventually had stopped because she concluded that "no one could help her." *Id.*, at 63.

The DPP official who conducted the interviews concluded the VIS by writing:

> "It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives. It is doubtful that they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their loved ones were murdered and taken from them." *Id.*, at 63–64.[4]

Defense counsel moved to suppress the VIS on the ground that this information was both irrelevant and unduly inflammatory, and that therefore its use in a capital case violated

---

[4] The complete VIS is reprinted in the Appendix to this opinion.

the Eighth Amendment of the Federal Constitution.[5]   The Maryland trial court denied the motion, ruling that the jury was entitled to consider "any and all evidence which would bear on the [sentencing decision]."   *Id.*, at 6.   Booth's lawyer then requested that the prosecutor simply read the VIS to the jury rather than call the family members to testify before the jury.   Defense counsel was concerned that the use of live witnesses would increase the inflammatory effect of the information.   The prosecutor agreed to this arrangement.

The jury sentenced Booth to death for the murder of Mr. Bronstein and to life imprisonment for the murder of Mrs. Bronstein.   On automatic appeal, the Maryland Court of Appeals affirmed the conviction and the sentences.   306 Md. 172, 507 A. 2d 1098 (1986).   The court rejected Booth's claim that the VIS injected an arbitrary factor into the sentencing decision.   The court noted that it had considered this argument in *Lodowski* v. *State*, 302 Md. 691, 490 A. 2d 1228 (1985), vacated on other grounds, 475 U. S. 1078 (1986), and concluded that a VIS serves an important interest by informing the sentencer of the full measure of harm caused by the crime.   The Court of Appeals then examined the VIS in Booth's case, and concluded that it is a "relatively straightforward and factual description of the effects of these murders on members of the Bronstein family."   306 Md., at 223, 507 A. 2d, at 1124.   It held that the death sentence had not been imposed under the influence of passion, prejudice, or other arbitrary factors.   See Md. Ann. Code, Art. 27, § 414(e)(1) (1982).

We granted certiorari to decide whether the Eighth Amendment prohibits a capital sentencing jury from consid-

---

[5] The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."   The prohibitions of the Eighth Amendment apply to the States through the Due Process Clause of the Fourteenth Amendment.   See *Robinson* v. *California*, 370 U. S. 660, 666 (1962).

ering victim impact evidence.    479 U. S. 882 (1986).    We conclude that it does, and now reverse.

## II

It is well settled that a jury's discretion to impose the death sentence must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg* v. *Georgia*, 428 U. S. 153, 189 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.); *California* v. *Ramos*, 463 U. S. 992, 999 (1983).    Although this Court normally will defer to a state legislature's determination of what factors are relevant to the sentencing decision, the Constitution places some limits on this discretion.    See, *e. g.*, *id.*, at 1000–1001.    Specifically, we have said that a jury must make an *"individualized* determination" whether the defendant in question should be executed, based on "the character of the individual and the circumstances of the crime." *Zant* v. *Stephens*, 462 U. S. 862, 879 (1983) (emphasis in original). See also *Eddings* v. *Oklahoma*, 455 U. S. 104, 112 (1982). And while this Court has never said that the defendant's record, characteristics, and the circumstances of the crime are the *only* permissible sentencing considerations, a state statute that requires consideration of other factors must be scrutinized to ensure that the evidence has some bearing on the defendant's "personal responsibility and moral guilt." *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982).    To do otherwise would create the risk that a death sentence will be based on considerations that are "constitutionally impermissible or totally irrelevant to the sentencing process."    See *Zant* v. *Stephens*, *supra*, at 885.

The VIS in this case provided the jury with two types of information.    First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family.    Second, it set forth the family members' opinions and characterizations of the crimes and the defendant.    For the reasons stated below, we find that this information is

irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner.

## A

The greater part of the VIS is devoted to a description of the emotional trauma suffered by the family and the personal characteristics of the victims. The State claims that this evidence should be considered a "circumstance" of the crime because it reveals the full extent of the harm caused by Booth's actions. In the State's view, there is a direct, foreseeable nexus between the murders and the harm to the family, and thus it is not "arbitrary" for the jury to consider these consequences in deciding whether to impose the death penalty. Although "victim impact" is not an aggravating factor under Maryland law,[6] the State claims that by knowing the extent

---

[6] Before the jury may impose a capital sentence, it must find that at least one of the following aggravating circumstances are present:

"(1) The victim was a law enforcement officer who was murdered while in the performance of his duties.

"(2) The defendant committed the murder at a time when he was confined in any correctional institution.

"(3) The defendant committed the murder in furtherance of an escape or an attempt to escape from or to evade the lawful custody, arrest, or detention of or by an officer or guard of a correctional institution or by a law enforcement officer.

"(4) The victim was taken or attempted to be taken in the course of a kidnapping or abduction, or an attempt to kidnap or abduct.

"(5) The victim was a child abducted in violation of § 2 of this article.

"(6) The defendant committed the murder pursuant to an agreement or contract for remuneration or the promise of remuneration to commit the murder.

"(7) The defendant engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration.

"(8) At the time of the murder the defendant was under sentence of death or imprisonment for life.

"(9) The defendant committed more than one offense of murder in the first degree arising out of the same incident.

of the impact upon and the severity of the loss to the family, the jury was better able to assess the "'gravity or aggravating quality'" of the offense.    Brief for Respondent 21 (quoting *Lodowski* v. *State*, 302 Md., at 741–742, 490 A. 2d, at 1254).

While the full range of foreseeable consequences of a defendant's actions may be relevant in other criminal and civil contexts, we cannot agree that it is relevant in the unique circumstance of a capital sentencing hearing.    In such a case, it is the function of the sentencing jury to "express the conscience of the community on the ultimate question of life or death."    *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968).  When carrying out this task the jury is required to focus on the defendant as a "uniquely individual human bein[g]."  *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976) (plurality opinion of Stewart, POWELL, and STEVENS, JJ.).    The focus of a VIS, however, is not on the defendant, but on the character and reputation of the victim and the effect on his family.    These factors may be wholly unrelated to the blameworthiness of a particular defendant.    As our cases have shown, the defendant often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family.    Moreover, defendants rarely select their victims based on whether the murder will have an effect on anyone other than the person murdered.[7]

---

"(10) The defendant committed the murder while committing or attempting to commit a robbery, arson, or rape, or sexual offense in the first degree."    See Md. Ann. Code, Art. 27, § 413(d) (1982 and Supp. 1986).

Because the impact of the crime on the victim is not a statutorily defined aggravating circumstance, it would not be sufficient, standing alone, to support a capital sentence.    § 413(f).

[7] As one state court has noted:

"We think it obvious that a defendant's level of culpability depends not on fortuitous circumstances such as the composition of his victim's family, but on circumstances over which he has control.    A defendant may choose, or decline, to premeditate, to act callously, to attack a vulnerable victim, to commit a crime while on probation, or to amass a record of offenses. . . . In contrast, the fact that a victim's family is irredeemably bereaved can be

Allowing the jury to rely on a VIS therefore could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence thus could divert the jury's attention away from the defendant's background and record, and the circumstances of the crime.

It is true that in certain cases some of the information contained in a VIS will have been known to the defendant before he committed the offense. As we have recognized, a defendant's degree of knowledge of the probable consequences of his actions may increase his moral culpability in a constitutionally significant manner. See *Tison* v. *Arizona*, 481 U. S. 137, 157–158 (1987). We nevertheless find that because of the nature of the information contained in a VIS, it creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner.

As evidenced by the full text of the VIS in this case, see Appendix to this opinion, the family members were articulate and persuasive in expressing their grief and the extent of their loss. But in some cases the victim will not leave behind a family, or the family members may be less articulate in describing their feelings even though their sense of loss is equally severe. The fact that the imposition of the death sentence may turn on such distinctions illustrates the danger of allowing juries to consider this information. Certainly the degree to which a family is willing and able to express its grief is irrelevant to the decision whether a defendant, who may merit the death penalty, should live or die. See 306 Md., at 233, 507 A. 2d, at 1129 (Cole, J., concurring in part and dissenting in part) (concluding that it is arbitrary to make capital sentencing decisions based on a VIS, "which

---

attributable to no act of will of the defendant other than his commission of homicide in the first place. Such bereavement is relevant to damages in a civil action, but it has no relationship to the proper purposes of sentencing in a criminal case." *People* v. *Levitt*, 156 Cal. App. 3d 500, 516–517, 203 Cal. Rptr. 276, 287–288 (1984).

vary greatly from case to case depending upon the ability of the family member to express his grief ").

Nor is there any justification for permitting such a decision to turn on the perception that the victim was a sterling member of the community rather than someone of questionable character.[8] This type of information does not provide a "principled way to distinguish [cases] in which the death penalty was imposed, from the many cases in which it was not." *Godfrey* v. *Georgia*, 446 U. S. 420, 433 (1980) (opinion of Stewart, J.). See also *Skipper* v. *South Carolina*, 476 U. S. 1, 14–15 (1986) (POWELL, J., concurring in judgment).

We also note that it would be difficult—if not impossible— to provide a fair opportunity to rebut such evidence without shifting the focus of the sentencing hearing away from the defendant. A threshold problem is that victim impact information is not easily susceptible to rebuttal. Presumably the defendant would have the right to cross-examine the declarants, but he rarely would be able to show that the family members have exaggerated the degree of sleeplessness, depression, or emotional trauma suffered. Moreover, if the state is permitted to introduce evidence of the victim's personal qualities,[9] it cannot be doubted that the defendant also

---

[8] We are troubled by the implication that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy. Of course, our system of justice does not tolerate such distinctions. Cf. *Furman* v. *Georgia*, 408 U. S. 238, 242 (1972) (Douglas, J., concurring).

[9] See n. 3, *supra*. The Maryland sentencing statute does not expressly permit evidence of the victim's character and community status to be included in the VIS. The Maryland Court of Appeals, however, apparently has determined that the statute only establishes the minimum amount of information that must be provided. Consideration of other information in the VIS is subject to the trial judge's discretion. See *Reid* v. *State*, 302 Md. 811, 820–821, 490 A. 2d 1289, 1294 (1985).

This type of information is not unique to the VIS in Booth's case. In *Lodowski* v. *State*, the trial court admitted a VIS based on an interview with the victim's wife that said in part:

must be given the chance to rebut this evidence. See *Gardner* v. *Florida*, 430 U. S. 349, 362 (1977) (opinion of STEVENS, J.) (due process requires that defendant be given a chance to rebut presentence report). See also Md. Ann. Code, Art. 27, § 413(c)(v) (1982). Putting aside the strategic risks of attacking the victim's character before the jury, in appropriate cases the defendant presumably would be permitted to put on evidence that the victim was of dubious moral character, was unpopular, or was ostracized from his family. The prospect of a "mini-trial" on the victim's character is more than simply unappealing; it could well distract the sentencing jury from its constitutionally required task—determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime. We thus reject the contention that the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics, are proper sentencing considerations in a capital case.[10]

---

"[The victim] was the perfect family person, he was totally devoted to his family. It was like a miracle to find a man like him—we had something very special. We had created a love that could withstand anything in life. We were not only husband and wife, but best friends." 302 Md., at 766, 490 A. 2d, at 1266 (Cole, J., concurring)

The court in *Lodowski* found that VIS evidence in general is not constitutionally proscribed, and is relevant to a capital sentencing determination. *Id.*, at 751, 752, 490 A. 2d, at 1259.

[10] Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime. Facts about the victim and family also may be relevant in a noncapital criminal trial. Moreover, there may be times that the victim's personal characteristics are relevant to rebut an argument offered by the defendant. See, *e. g.*, Fed. Rule Evid. 404(a)(2) (prosecution may show peaceable nature of victim to rebut charge that victim was aggressor). The trial judge, of course, continues to have the primary responsibility for deciding when this information is sufficiently relevant to some legitimate

## B

The second type of information presented to the jury in the VIS was the family members' opinions and characterizations of the crimes.   The Bronsteins' son, for example, stated that his parents were "butchered like animals," and that he "doesn't think anyone should be able to do something like that and get away with it."   App. 61.   The VIS also noted that the Bronstein's daughter

> "could never forgive anyone for killing [her parents] that way.   She can't believe that anybody could do that to someone.   The victims' daughter states that animals wouldn't do this.   [The perpetrators] didn't have to kill because there was no one to stop them from looting. . . . The murders show the viciousness of the killers' anger. She doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this."   *Id.*, at 62.

One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings.   But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant.   As we have noted, any decision to impose the death sentence must "be, and appear to be, based on reason rather than caprice or emotion."   *Gardner* v. *Florida, supra,* at 358 (opinion of STEVENS, J.).   The admission of these emotionally charged opinions as to what conclusions the jury should draw from the evidence clearly

---

consideration to be admissible, and when its probative value outweighs any prejudicial effect.   Cf. Fed. Rule Evid. 403.

is inconsistent with the reasoned decisionmaking we require in capital cases.[11]

### III

We conclude that the introduction of a VIS at the sentencing phase of a capital murder trial violates the Eighth Amendment, and therefore the Maryland statute is invalid to the extent it requires consideration of this information.[12] The decision of the Maryland Court of Appeals is vacated to the extent that it affirmed the capital sentence. The case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

### APPENDIX TO OPINION OF THE COURT
### "VICTIM IMPACT STATEMENT

[The Victim Impact Statement in this case was prepared by the Maryland Division of Parole and Probation. See n. 2, *supra.*]

---

[11] The same problem is presented by the VIS summary written by the DPP that might be viewed by the jury as representing the views of the State. As noted *supra*, at 500, the writer concluded that the crimes had a "shocking, painful, and devast[at]ing" effect on the family, and that "[i]t is doubtful that they will ever be able to fully recover." App. 63–64. See Appendix to this opinion.

[12] We note, however, that our decision today is guided by the fact death is a "punishment different from all other sanctions," see *Woodson* v. *North Carolina*, 428 U. S. 280, 303–304, 305 (1976) (plurality opinion of Stewart, POWELL, and STEVENS, JJ.), and that therefore the considerations that inform the sentencing decision may be different from those that might be relevant to other liability or punishment determinations. At least 36 States permit the use of victim impact statements in some contexts, reflecting a legislative judgment that the effect of the crime on victims should have a place in the criminal justice system. See National Organization for Victim Assistance, Victim Rights and Services: A Legislative Directory 32–33 (1985) (chart); McLeod, Victim Participation at Sentencing, 22 Crim. L. Bull. 501, 507, and n. 22 (1986). Congress also has provided for victim participation in federal criminal cases. See Fed. Rule Crim. Proc. 32(c)(2)(C). We imply no opinion as to the use of these statements in noncapital cases.

"Mr. and Mrs. Bronstein's son, daughter, son-in-law, and granddaughter were interviewed for purposes of the Victim Impact Statement. There are also four other grandchildren in the family. The victims' son reports that his parents had been married for fifty-three years and enjoyed a very close relationship, spending each day together. He states that his father had worked hard all his life and had been retired for eight years. He describes his mother as a woman who was young at heart and never seemed like an old lady. She taught herself to play bridge when she was in her seventies. The victims' son relates that his parents were amazing people who attended the senior citizens' center and made many devout friends. He indicates that he was very close to his parents, and that he talked to them every day. The victims' daughter also spent lots of time with them.

"The victims' son saw his parents alive for the last time on May 18th. They were having their lawn manicured and were excited by the onset of spring. He called them on the phone that evening and received no answer. He had made arrangements to pick Mr. Bronstein up on May 20th. They were both to be ushers in a granddaughter's wedding and were going to pick up their tuxedos. When he arrived at the house on May 20th he noticed that his parents' car wasn't there. A neighbor told him that he hadn't seen the car in several days and he knew something was wrong. He went to his parents' house and found them murdered. He called his sister crying and told her to come right over because something terrible had happened and their parents were both dead.

"The victims' daughter recalls that when she arrived at her parents' house, there were police officers and television crews everywhere. She felt numb and cold. She was not allowed to go into the house and so she went to a neighbor's home. There were people and reporters everywhere and all she could feel was cold. She called her older daughter and told her what had happened. She told her daughter to get

her husband and then tell her younger daughter what had happened. The younger daughter was to be married two days later.

"The victims' granddaughter reports that just before she received the call from her mother she had telephoned her grandparents and received no answer. After her mother told her what happened she turned on the television and heard the news reports about it. The victims' son reports that his children first learned about their grandparents death from the television reports.

"Since the Jewish religion dictates that birth and marriage are more important than death, the granddaughter's wedding had to proceed on May 22nd. She had been looking forward to it eagerly, but it was a sad occasion with people crying. The reception, which normally would have lasted for hours, was very brief. The next day, instead of going on her honeymoon, she attended her grandparents' funerals. The victims' son, who was an usher at the wedding, cannot remember being there or coming and going from his parents' funeral the next day. The victims' granddaughter, on the other hand, vividly remembers every detail of the days following her grandparents' death. Perhaps she described the impact of the tragedy most eloquently when she stated that it was a completely devastating and life altering experience.

"The victims' son states that he can only think of his parents in the context of how he found them that day, and he can feel their fear and horror. It was 4:00 p.m. when he discovered their bodies and this stands out in his mind. He is always aware of when 4:00 p.m. comes each day, even when he is not near a clock. He also wakes up at 4:00 a.m. each morning. The victims' son states that he suffers from lack of sleep. He is unable to drive on the streets that pass near his parents' home. He also avoids driving past his father's favorite restaurant, the supermarket where his parents shopped, etc. He is constantly reminded of his parents. He sees his father coming out of synagogues, sees his parents'

car, and feels very sad whenever he sees old people. The victims' son feels that his parents were not killed, but were butchered like animals. He doesn't think anyone should be able to do something like that and get away with it. He is very angry and wishes he could sleep and not feel so depressed all the time. He is fearful for the first time in his life, putting all the lights on and checking the locks frequently. His children are scared for him and concerned for his health. They phone him several times a day. At the same time he takes a fearful approach to the whereabouts of his children. He also calls his sister every day. He states that he is frightened by his own reaction of what he would do if someone hurt him or a family member. He doesn't know if he'll ever be the same again.

"The victims' daughter and her husband didn't eat dinner for three days following the discovery of Mr. and Mrs. Bronstein's bodies. They cried together every day for four months and she still cries every day. She states that she doesn't sleep through a single night and thinks a part of her died too when her parents were killed. She reports that she doesn't find much joy in anything and her powers of concentration aren't good. She feels as if her brain is on overload. The victims' daughter relates that she had to clean out her parents' house and it took several weeks. She saw the bloody carpet, knowing that her parents had been there, and she felt like getting down on the rug and holding her mother. She wonders how this could have happened to her family because they're just ordinary people. The victims' daughter reports that she had become noticeably withdrawn and depressed at work and is now making an effort to be more outgoing. She notes that she is so emotionally tired because she doesn't sleep at night, that she has a tendency to fall asleep when she attends social events such as dinner parties or the symphony. The victims' daughter states that wherever she goes she sees and hears her parents. This happens every day. She cannot look at kitchen knives without being re-

minded of the murders and she is never away from it. She states that she can't watch movies with bodies or stabbings in it. She can't tolerate any reminder of violence. The victims' daughter relates that she used to be very trusting, but is not any longer. When the doorbell rings she tells her husband not to answer it. She is very suspicious of people and was never that way before.

"The victims' daughter attended the defendant's trial and that of the co-defendant because she felt someone should be there to represent her parents. She had never been told the exact details of her parents' death and had to listen to the medical examiner's report. After a certain point, her mind blocked out and she stopped hearing. She states that her parents were stabbed repeatedly with viciousness and she could never forgive anyone for killing them that way. She can't believe that anybody could do that to someone. The victims' daughter states that animals wouldn't do this. They didn't have to kill because there was no one to stop them from looting. Her father would have given them anything. The murders show the viciousness of the killers' anger. She doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this. She feels that the lives of her family members will never be the same again.

"The victims' granddaughter states that unless you experience something like this you can't understand how it feels. You are in a state of shock for several months and then a terrible depression sets in. You are so angry and feel such rage. She states that she only dwells on the image of their death when thinking of her grandparents. For a time she would become hysterical whenever she saw dead animals on the road. She is not able to drive near her grandparents' house and will never be able to go into their neighborhood again. The victims' granddaughter also has a tendency to turn on all the lights in her house. She goes into a panic if

her husband is late coming home from work. She used to be an avid reader of murder mysteries, but will never be able to read them again. She has to turn off the radio or T.V. when reports of violence come on because they hit too close to home. When she gets a newspaper she reads the comics and throws the rest away. She states that it is the small everyday things that haunt her constantly and always will. She saw a counselor for several months but stopped because she felt that no one could help her.

"The victims' granddaughter states that the whole thing has been very hard on her sister too. Her wedding anniversary will always be bittersweet and tainted by the memory of what happened to her grandparents. This year on her anniversary she and her husband quietly went out of town. The victims' granddaughter finds that she is unable to look at her sister's wedding pictures. She also has a picture of her grandparents, but had to put it away because it was too painful to look at it.

"The victims' family members note that the trials of the suspects charged with these offenses have been delayed for over a year and the postponements have been very hard on the family emotionally. The victims' son notes that he keeps seeing news reports about his parents' murder which show their house and the police removing their bodies. This is a constant reminder to him. The family wants the whole thing to be over with and they would like to see swift and just punishment.

"As described by their family members, the Bronsteins were loving parents and grandparents whose family was most important to them. Their funeral was the largest in the history of the Levinson Funeral Home and the family received over one thousand sympathy cards, some from total strangers. They attempted to answer each card personally. The family states that Mr. and Mrs. Bronstein were extremely good people who wouldn't hurt a fly. Because of their loss, a terrible void has been put into their lives and

every day is still a strain just to get through.   It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives.   It is doubtful that they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their loved ones were murdered and taken from them."   App. 59–64.

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

"[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."   *Gregg* v. *Georgia,* 428 U. S. 153, 184 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.).   The affront to humanity of a brutal murder such as petitioner committed is not limited to its impact on the victim or victims; a victim's community is also injured, and in particular the victim's family suffers shock and grief of a kind difficult even to imagine for those who have not shared a similar loss.   Maryland's legislature has decided that the jury should have the testimony of the victim's family in order to assist it in weighing the degree of harm that the defendant has caused and the corresponding degree of punishment that should be inflicted.   This judgment is entitled to particular deference; determinations of appropriate sentencing considerations are "'peculiarly questions of legislative policy,'" *id.,* at 176 (quoting *Gore* v. *United States,* 357 U. S. 386, 393 (1958)), and the Court should recognize that "'[i]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people,'" 428 U. S., at 175 (quoting *Furman* v. *Georgia,* 408 U. S. 238, 383 (1972) (Burger, C. J., dissenting)).   I cannot agree that there was anything "cruel or unusual" or other-

wise unconstitutional about the legislature's decision to use victim impact statements in capital sentencing hearings.

The Court's judgment is based on the premises that the harm that a murderer causes a victim's family does not in general reflect on his blameworthiness, and that only evidence going to blameworthiness is relevant to the capital sentencing decision. Many if not most jurors, however, will look less favorably on a capital defendant when they appreciate the full extent of the the harm he caused, including the harm to the victim's family. There is nothing aberrant in a juror's inclination to hold a murderer accountable not only for his internal disposition in committing the crime but also for the full extent of the harm he caused; many if not most persons would also agree, for example, that someone who drove his car recklessly through a stoplight and unintentionally killed a pedestrian merits significantly more punishment than someone who drove his car recklessly through the same stoplight at a time when no pedestrian was there to be hit. I am confident that the Court would not overturn a sentence for reckless homicide by automobile merely because the punishment exceeded the maximum sentence for reckless driving; and I would hope that the Court would not overturn the sentence in such a case if a judge mentioned, as relevant to his sentencing decision, the fact that the victim was a mother or father. But if punishment can be enhanced in noncapital cases on the basis of the harm caused, irrespective of the offender's specific intention to cause such harm,[1] I fail to see

---

[1] Congress considers the effect of crime on its victims a relevant sentencing consideration. Thus, presentence reports prepared pursuant to Federal Rule of Criminal Procedure 32(c)(2) must include "information concerning any harm, including financial, social, psychological, and physical harm, done to or loss suffered by any victim of the offense . . . ."

This Court's cases also indicate that the harm caused by an offense may be the basis for punishment even if the offender lacked the specific intent to commit that harm. See, e. g., United States v. Feola, 420 U. S. 671 (1975) (conviction under 18 U. S. C. § 111 for assaulting a federal officer does not require proof that the defendant knew the victim's status).

why the same approach is unconstitutional in death cases. If anything, I would think that victim impact statements are particularly appropriate evidence in capital sentencing hearings: the State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, see, *e. g., Eddings* v. *Oklahoma,* 455 U. S. 104 (1982), by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.

The Court is "troubled by the implication that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy," and declares that "our system of justice does not tolerate such distinctions." *Ante,* at 506, n. 8. It is no doubt true that the State may not encourage the sentencer to rely on a factor such as the victim's race in determining whether the death penalty is appropriate. Cf. *McCleskey* v. *Kemp,* 481 U. S. 279 (1987). But I fail to see why the State cannot, if it chooses, include as a sentencing consideration the particularized harm that an individual's murder causes to the rest of society[2] and in particular to his family. To the extent that the Court is concerned that sentencing juries might be moved by victim impact statements to rely on impermissible factors such as the race of the victim, there is no showing that the statements in this case encouraged this, nor should we lightly presume such misconduct on the jury's part. Cf. *McCleskey* v. *Kemp, supra.*

The Court's reliance on the alleged arbitrariness that can result from the differing ability of victims' families to articu-

---

[2] I doubt that the Court means to suggest that there is any constitutional impediment, for example, to authorizing the death sentence for the assassination of the President or Vice President, see 18 U. S. C. §§ 1751, 1111, a Congressman, Cabinet official, Supreme Court Justice, or the head of an executive department, 18 U. S. C. § 351, or the murder of a policeman on active duty, see Md. Ann. Code, Art. 27, § 413(d)(1) (1982).

late their sense of loss is a makeweight consideration: No two prosecutors have exactly the same ability to present their arguments to the jury; no two witnesses have exactly the same ability to communicate the facts; but there is no requirement in capital cases that the evidence and argument be reduced to the lowest common denominator.

The supposed problems arising from a defendant's rebuttal of victim impact statements are speculative and unconnected to the facts of this case. No doubt a capital defendant must be allowed to introduce relevant evidence in rebuttal to a victim impact statement, but Maryland has in no wise limited the right of defendants in this regard. Petitioner introduced no such rebuttal evidence, probably because he considered, wisely, that it was not in his best interest to do so.[3] At bottom, the Court's view seems to be that it is somehow unfair to confront a defendant with an account of the loss his deliberate act has caused the victim's family and society. I do not share that view, but even if I did I would be unwilling to impose it on States that see matters differently.

The Court's concern that the grief and anger of a victim's family will "inflame the jury," *ante*, at 508, is based in large part on its view that the loss which such survivors suffer is irrelevant to the issue of punishment—a view with which I have already expressed my disagreement. To the extent that the Court determines that in this case it was inappropriate to allow the victims' family to express their opinions on, for example, whether petitioner could be rehabilitated, that is obviously not an inherent fault in all victim impact statements and no reason to declare the practice of admitting

---

[3] The possibility that the jury would be distracted by rebuttal evidence is purely hypothetical, since petitioner introduced no such evidence. It is also unclear how distracting (as opposed to offending) the jury would disadvantage the defendant, and why, if there were some disadvantage to the defendant in pressing too hard a rebuttal to a victim impact statement, he should be heard to complain of the consequences of his tactical decisions.

such statements at capital sentencing hearings *per se* unconstitutional.   I respectfully dissent.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE, JUSTICE WHITE, and JUSTICE O'CONNOR join, dissenting.

The Court holds that because death is a "'punishment different from all other sanctions,'" *ante*, at 509, n. 12 (quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 303–304 (1976) (plurality opinion of Stewart, POWELL, and STEVENS, JJ.)), considerations not relevant to "the defendant's 'personal responsibility and moral guilt'" cannot be taken into account in deciding whether a defendant who is eligible for the death penalty should receive it, *ante*, at 502 (quoting *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982)).   It seems to me, however—and, I think, to most of mankind—that the amount of harm one causes does bear upon the extent of his "personal responsibility."   We may take away the license of a driver who goes 60 miles an hour on a residential street; but we will put him in jail for manslaughter if, though his moral guilt is no greater, he is unlucky enough to kill someone during the escapade.

Nor, despite what the Court says today, do we depart from this principle where capital punishment is concerned.   The Court's opinion does not explain why a defendant's *eligibility* for the death sentence can *(and always does)* turn upon considerations not relevant to his moral guilt.   If a bank robber aims his gun at a guard, pulls the trigger, and kills his target, he may be put to death.   If the gun unexpectedly misfires, he may not.   His moral guilt in both cases is identical, but his responsibility in the former is greater.   Less than two months ago, we held that two brothers who planned and assisted in their father's escape from prison could be sentenced to death because in the course of the escape their father and an accomplice murdered a married couple and two children. *Tison* v. *Arizona*, 481 U. S. 137 (1987).   Had their father allowed the victims to live, the brothers could not be put to death; but because he decided to kill, the brothers may.

The difference between life and death for these two defendants was thus a matter "wholly unrelated to the[ir] blameworthiness." *Ante*, at 504. But it was related to their personal responsibility, *i. e.*, to the degree of harm that they had caused. In sum, the principle upon which the Court's opinion rests—that the imposition of capital punishment is to be determined solely on the basis of moral guilt—does not exist, neither in the text of the Constitution, nor in the historic practices of our society, nor even in the opinions of this Court.

Recent years have seen an outpouring of popular concern for what has come to be known as "victims' rights"—a phrase that describes what its proponents feel is the failure of courts of justice to take into account in their sentencing decisions not only the factors mitigating the defendant's moral guilt, but also the amount of harm he has caused to innocent members of society. Many citizens have found one-sided and hence unjust the criminal trial in which a parade of witnesses comes forth to testify to the pressures beyond normal human experience that drove the defendant to commit his crime, with no one to lay before the sentencing authority the full reality of human suffering the defendant has produced—which (and *not* moral guilt alone) is one of the reasons society deems his act worthy of the prescribed penalty. Perhaps these sentiments do not sufficiently temper justice with mercy, but that is a question to be decided through the democratic processes of a free people, and not by the decrees of this Court. There is nothing in the Constitution that dictates the answer, no more in the field of capital punishment than elsewhere.

To require, as we have, that all mitigating factors which render capital punishment a harsh penalty in the particular case be placed before the sentencing authority, while simultaneously requiring, as we do today, that evidence of much of the human suffering the defendant has inflicted be suppressed, is in effect to prescribe a debate on the appropriateness of the capital penalty with one side muted. If that pen-

alty is constitutional, as we have repeatedly said it is, it seems to me not remotely unconstitutional to permit both the pros and the cons in the particular case to be heard.