560 So.2d 203 (1990)
Grover REED, Appellant,
v.
STATE of Florida, Appellee.
No. 70069.
Supreme Court of Florida.
March 1, 1990.
Rehearing Denied May 29, 1990.
*204 Michael E. Allen, Public Defender, and William C. McLain, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen., and William A. Hatch and Richard E. Doran, Asst. Attys. Gen., Tallahassee, for appellee.
PER CURIAM.
Grover Reed appeals from a jury verdict of guilt for first-degree murder, sexual battery, and robbery and a sentence of death imposed for the murder conviction. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The record reflects the following pertinent facts. In December of 1985 Reed, accompanied by his woman friend and two young children, arrived in Jacksonville homeless and destitute. Through Traveler's Aid they were given shelter in the home of the Reverend Ervin Oermann, a Lutheran minister. They stayed with Reverend Oermann and his wife, Betty, for just over a week but were asked to leave when Reverend Oermann discovered that Reed had drug paraphernalia. However, Reed continued to receive aid from the Oermanns in the form of money and transportation. Eventually the Oermanns began to feel they were being used and withdrew all support. Reed resented the discontinuance of aid and vowed to get even.
On February 27, 1986, Reverend Oermann returned home from a night class and found his wife, Betty, dead on the living room floor. An autopsy showed she had been strangled, raped, and stabbed repeatedly in the throat. Found in the house was a distinctive baseball cap. For some time this cap was the only lead police had, so they produced a television recreation of the crime and showed the cap. One viewer recognized the cap as being much like one Reed wore. Further investigation revealed that Reed was last seen wearing his cap on the day Mrs. Oermann was killed. Ultimately, he was arrested.
The most significant evidence of Reed's guilt may be summarized as follows:
(a) Witnesses said they had seen Reed wearing his baseball cap on the day of the murder before the probable time of death but not thereafter. They positively identified the cap as Reed's because of the presence of certain stains and mildew.
(b) Reed's fingerprints were found on checks that had been taken from the Oermann home and had been found in the yard.
(c) An expert witness gave testimony that hairs found on the body and in the baseball cap were consistent with Reed's hair.
(d) Another expert witness gave testimony that the semen found in the body could have been Reed's.
(e) Reed's cellmate, Nigel Hackshaw, gave testimony that Reed had admitted breaking into the Oermann house and killing Mrs. Oermann.
The jury found Reed guilty. Neither side presented additional evidence in the penalty phase. After hearing arguments by counsel, the jury recommended death by an eleven-to-one vote. The judge delayed sentencing in order that a presentence investigation could be completed. After receiving the PSI and after considering additional mitigating evidence presented by Reed, the trial judge sentenced him to *205 death. The judge found six aggravating factors[1] and nothing in mitigation.
Reed raises six issues in this appeal. The first involves jury selection. During the course of voir dire, the prosecutor used eight of his ten peremptory strikes to excuse blacks from the jury. After both sides had expended their peremptories, defense counsel moved for a mistrial pursuant to State v. Neil, 457 So.2d 481 (Fla. 1984). At this point, Mr. Bateh, the prosecutor, asked to explain his reasons for striking the black jurors. The court stated:
Anyway, I'm well aware if the court determines that there's a prima facie showing of exclusion of jurors on a racial basis that it requires the State to make some showing to the court as to why they excluded them for other than racial basis, which Mr. Bateh is volunteering to do without me making a finding is what I understand you're saying.
After listening to the prosecutor's explanation for striking the black jurors, the following discussion ensued:
THE COURT: All right. The state, of course, has submitted to a voluntary Neil inquiry, in essence, in this regard without the Court making an initial determination that it was necessary. The two observations  and I don't have the statistics in front of me, but  and I'm not basing this decision on statistics, but I think we're all aware that somewhere in the neighborhood of 25 percent of the population of the registration in Duval County is black. I'm not sure those are accurate, but I think it's in that neighborhood. The composition of this jury right now, the present composition of the 12 jurors, there's two, which makes 16 and two-thirds of the jury is black of the 12. There's no blacks as far as alternates are concerned. Might I assume the victim in the case is white?
MR. BATEH: That's correct, Your Honor.
MR. NICHOLS: Yes, sir.
THE COURT: The defendant is white. I don't question his standing to raise the question. There is a standing to raise the question, but taking the representations of Mr. Bateh, I find that the challenges exercised against the blacks are not based purely upon race or racial discrimination and, consequently, I will deny any motion for a mistrial or more properly, probably, a motion to strike the entire panel, but, at any rate, I deny the motion on that basis.
In State v. Neil, 457 So.2d 481 (Fla. 1984), and State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988), we established procedures that were intended to abolish the discriminatory exercise of peremptory challenges. The defense must make a prima facie showing that there has been a strong likelihood that the jurors have been challenged because of their race. If the judge makes that finding, the burden shifts to the prosecution to show valid nonracial reasons why the individual minority jurors were struck. Neil.
In Kibler v. State, 546 So.2d 710, 712 (Fla. 1989), this Court recently said:
We hold that under article I, section 16 of the Florida Constitution it is unnecessary that the defendant who objects to peremptory challenges directed to members of a cognizable racial group be of the same race as the jurors who are being challenged. This does not mean, however, that the respective races of the challenged jurors and of the person who objects to the challenges may not be relevant in the determination of whether the challenges are being unconstitutionally exercised because of group bias. Under the procedure prescribed by Neil, the objecting party must ordinarily do *206 more than simply show that several members of a cognizable racial group have been challenged in order to meet his initial burden. Thus, a defendant of a different race than the jurors being challenged may have more difficulty convincing the trial court that "there is a strong likelihood that they have been challenged only because of their race." Moreover, in those cases in which the inquiry has been directed to the challenging party, the respective races of the challenged jurors and the defendant may also be relevant in the determination of whether the challenging party has met the burden of showing that the challenges were made for reasons not solely related to race.
(citation omitted).
Within the limitations imposed by State v. Neil, the trial judge necessarily is vested with broad discretion in determining whether peremptory challenges are racially intended. State v. Slappy. Only one who is present at the trial can discern the nuances of the spoken word and the demeanor of those involved. Given the circumstances that both the defendant and the victim were white and that two black jurors were already seated, we cannot say that the trial judge abused his discretion in concluding that the defense had failed to make a prima facie showing that there was a strong likelihood that the jurors were challenged because of their race.
Reed was not prejudiced by the prosecutor having given explanations for his challenges. In fact, if it appeared from the prosecutor's explanation that his challenges were racially motivated, the trial judge would have been warranted in granting a mistrial despite not yet having ruled that the defense had made a prima facie showing. Here, Reed does not question the prosecutor's motivation for five of his eight challenges, and the reasons for the other three had at least some facial legitimacy. In trying to achieve the delicate balance between eliminating racial prejudice and the right to exercise peremptory challenges, we must necessarily rely on the inherent fairness and color blindness of our trial judges who are on the scene and who themselves get a "feel" for what is going on in the jury selection process.
Reed next advances an argument based on Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), attacking statements by the judge and prosecutor to the effect that the jury's decision would be advisory and that the ultimate sentencing decision would be made by the judge. We have ruled that Caldwell claims based on these types of comments offer no relief in that both the prosecutor and the judge were correctly stating the law. Grossman v. State, 525 So.2d 833 (Fla. 1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989); Combs v. State, 525 So.2d 853 (Fla. 1988). In any event, there was no objection here, and thus the issue was not preserved for appeal.
Reed next argues that the trial judge erred when he refused in the penalty phase to instruct the jury on his impaired capacity to appreciate the criminality of his conduct. He asserts that his alcohol consumption on the date of the crime was to blame. However, the record fails to reflect that Reed was even under the influence of alcohol, let alone so intoxicated that his mental capacity was diminished. The evidence establishes only that Reed drank beer in the morning of the crime and had some beer in his possession about 1:00 p.m. Mrs. Oermann was killed between 6:45 and 8:00 p.m. There was no abuse of discretion in refusing to give the requested instruction.
Reed also argues that the court erred in not securing his personal waiver of the right to have the jury instructed on the necessarily lesser included offenses to robbery and sexual battery. In Harris v. State, 438 So.2d 787 (Fla. 1983), cert. denied, 466 U.S. 963, 104 S.Ct. 2181, 80 L.Ed.2d 563 (1984), we held that it was necessary for the defendant knowingly and intelligently to waive the instructions on the necessarily lesser included offenses to first-degree murder. However, in Jones v. State, 484 So.2d 577 (Fla. 1986), we held *207 that counsel could waive the instructions on necessarily lesser included offenses to noncapital crimes without a showing that the defendant had knowingly and intelligently joined in the decision. While the instant trial included a capital charge, the sexual battery and robbery charges were noncapital crimes to which the rule of Jones applied.
Relying upon Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), Reed also complains that the presentence investigation report contained a statement of the victim's husband that he believed the court should impose the death penalty. Unlike Booth, no victim impact evidence was presented to the jury. As in Grossman, this claim is foreclosed by the lack of an objection. In any event, the inclusion of this information in the presentence investigation report was harmless error. See Grossman.
Finally, Reed attacks four of the six aggravating circumstances.[2] The prior felonies of violence relied upon by the judge were the other felonies committed against Mrs. Oermann. The state concedes that our decision in Wasko v. State, 505 So.2d 1314 (Fla. 1987), renders this aggravating circumstance invalid. We also agree that the finding that the killing was cold, calculated, and premeditated cannot stand. The only evidence which might support the conclusion that Reed intended to kill Mrs. Oermann when he went to her home was his comment made prior to the killing that he would "get even" with the Oermanns for their asking him to leave their house. However, he did not specify how he would get even, and his intent could have been, as he told his cellmate, to burglarize their house. The requisite evidence of heightened premeditation was not proven beyond a reasonable doubt. Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).
On the other hand, the evidence supports the finding that the killing was especially heinous, atrocious, and cruel. Upon first encountering Mrs. Oermann, Reed slapped her and tied her up. He then severely beat her, leaving numerous bruises on her body. Following this, he choked the victim and then raped her. Finally, he slashed her throat more than a dozen times. The medical examiner testified that because the stab wounds were made with a serrated-edge knife, they would have taken more time and effort to inflict. Likewise, Reed told his cellmate, Nigel Hackshaw, that he cut the victim's throat "to keep her from talking," thus proving the aggravating circumstance of committing the killing to avoid lawful arrest.
The elimination of the two aggravating circumstances would not have affected Reed's sentence. Rogers; Jackson v. Wainwright, 421 So.2d 1385 (Fla. 1982), cert. denied, 463 U.S. 1229, 103 S.Ct. 3572, 77 L.Ed.2d 1412 (1983). There remain four aggravating circumstances balanced against a total absence of mitigating circumstances. We affirm the judgment and sentence.
It is so ordered.
EHRLICH, C.J., and OVERTON, McDONALD, BARKETT and GRIMES, JJ., concur.
SHAW, J., concurs in result only.
KOGAN, J., dissents.
NOTES
[1] They were: (1) The defendant was previously convicted of other felonies involving the use or threat of violence to the person. (2) The capital felony was committed while the defendant was engaged in the commission of sexual battery. (3) The capital felony was committed for the purpose of avoiding or preventing a lawful arrest. (4) The capital felony was committed for pecuniary gain. (5) The capital felony was especially heinous, atrocious, or cruel. (6) The capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
[2] He does not challenge the findings that the homicide was perpetrated during the commission of a sexual battery or that the homicide was committed for pecuniary gain.