PER CURIAM.
These parties are before us a second time, the original appeal having resulted in a remand to the trial court to “interview all the jurors and make the initial factual determination as to whether the evidence supports a finding of misconduct on the part of the jury.” Singletary v. Lewis, 584 So.2d 634, 637 (Fla. 1st DCA 1991). In the first appeal, this court found that only one of Singletary’s issues merited consideration: Whether allegations of concealment of material facts at voir dire, and allegations of improper consideration and racial bias among jurors required the trial court to grant Singletary’s request for juror interviews. Singletary prevailed on this issue, and we remanded the case with instructions that the trial court conduct the requested interviews.
In the instant appeal, Singletary asserts error in 1) the trial court’s refusal to order a new trial based upon allegations that a juror concealed material knowledge on voir dire, 2) the trial court's refusal to order a new trial based upon allegations of juror racial bias, and 3) the trial court’s apportioning of appellate costs between the parties. In light of the results of the juror interviews, we find no merit in the claim of concealment of material knowledge, and affirm on that issue. Additionally, we affirm all costs except for that portion of the order awarding costs to appellee/defen-dant, where appellee never filed a timely motion for costs as required by Florida Rule of Appellate Procedure 9.400(a). Lastly, for the reasons set forth below, we affirm the denial of appellant’s motion for new trial, which was based upon alleged juror misconduct evidencing racial bias.
Appellant, Kathryn Singletary (a black female), brought suit against appellee, Dr. Mary Lewis (a white female), alleging medical malpractice in the delivery of Single-tary’s son. Following an eight-day trial, the jury returned a verdict for Dr. Lewis. Sometime later, the alternate juror, Lump- *353 kin, informed Singletary about improper remarks made by jurors during the trial. The trial court heard testimony from Lumpkin, who stated that she believed from “little comments that they made,” that the five white jurors were biased against Singletary because she was black. When asked whether she heard racial remarks, Lumpkin admitted that she heard none. Pressed for specifics, Lumpkin related a comment allegedly made by juror Tuten more than once during the trial that “They ought to sewed her (Singletary) up. She was a fool for having so many babies.” Despite Lumpkin’s testimony, which also suggested that Tuten failed to disclose knowledge of the Singletary family during voir dire, the trial court declined to conduct further juror interviews. On appeal, this court reversed and remanded the case so that the trial judge, after juror interviews, could “make the initial factual determination as to whether the evidence supports a finding of misconduct on the part of the jury.” 584 So.2d at 637.
Juror interviews were held twenty-seven months after the trial. Interview questions were submitted to the court by counsel, based upon alternate juror Lumpkin’s charges. The trial judge interviewed the six jurors, and allowed additional questioning and summary statements by counsel. Of the alleged improprieties testified to by Lumpkin, the most serious remark that was confirmed by other jurors was the “sewed up” comment that Lumpkin attributed to Tuten. The record reveals that two jurors, Scippio and Smith, recalled hearing all or part of that remark. Juror Scippio, the only black juror other than Lumpkin, recalled a comment “that she (presumably Mrs. Singletary) should have been sewed up,” but she did not remember who made the comment or when it was made. When asked what the comment meant to her, juror Scippio answered that “it don’t mean anything.” Juror Scippio at first vaguely recalled the remark about having too many babies, but upon re-examination claimed she had no memory of that same remark. Juror Smith testified that the sewing-up comment was not directed at Mrs. Single-tary but that juror Tuten was speaking of herself, indicating that she (Tuten) would have herself “sewed up” before having so many babies. Like Scippio, Smith could not recall a comment to the effect that Single-tary was a fool for having so many babies. Although Smith “was a little bit embarrassed” by the sewing-up comment, she did not perceive it as derogatory toward Sin-gletary. For her part, juror Tuten denied hearing or making a comment to the effect that Mrs. Singletary should have been “sewed up” to keep from becoming pregnant.
After interviewing the jurors and hearing argument from counsel, the trial court expressed its findings:
Hit’s here for me to find if there was any misconduct on the part of the jury and I don’t find any present.... And when I hear all six of the [jurors], it’s quite different from what Mrs. Lumpkin said initially. And when I listened to her initially I didn’t find, you know, the extent necessary for a new trial, but hindsight and education from the District Court makes it clear I should have talked to all of them, as we now have, and they’ve been quite emphatic that there’s just nothing there.... [W]hat I heard today is far different than was insinuated by Mrs. Lumpkin_ As to the sewing up part, Mrs. Lumpkin may have taken it some way, as she says she did, but no one else did. There wasn’t but one or two that said they’d even heard something about it, and it was — one of them said that Mrs. Tuten was saying that as to herself. Even if it was said exactly as Mrs. Lumpkin said, it doesn’t necessarily show racial bias or prejudice or anything else. It’s just somebody makes a comment, but I don’t find it to be as Mrs. Lumpkin said.
The court dismissed remarks about welfare support for the injured child as merely evidencing the jurors’ humanitarian concern for the child. The court concluded, “I don’t find the evidence here to support any misconduct on the part of the jury ... and will deny the motion for new trial.”
Whether one agrees or disagrees with the trial court’s conclusion, it at least *354 appears that the court employed the proper procedure to determine whether there was juror misconduct requiring a new trial. Specifically, the court looked to Singletary to establish the actual juror misconduct. If established, Singletary would then be entitled to a new trial unless the opposing party could demonstrate that there was no reasonable possibility that the misconduct affected the verdict. See Baptist Hospital of Miami, Inc. v. Maler, 579 So.2d 97, 100 n. 1 (Fla.1991) (citing State v. Hamilton, 574 So.2d 124, 129 (Fla.1991)). Finding no misconduct, the trial court did not inquire whether the alleged misconduct affected the verdict.
Much of Singletary’s argument on appeal mistakenly assumes the existence of juror misconduct, and urges that such misconduct necessitates a new trial without regard to its effect upon the verdict. Thus, Singletary argues that this case is controlled by Sanchez v. International Park Condominium Association, Inc., 563 So.2d 197 (Fla. 3d DCA 1990), which she cites for the proposition that comments reflecting a juror’s racial or ethnic bias will necessitate a new trial regardless of whether the comments influenced other jurors. In Sanchez, the plaintiff in a slip-and-fall case was of Cuban extraction. After the jury returned a verdict attributing to the plaintiff ninety-six percent contributory negligence, jury interviews revealed that one juror had described Cubans as “ambulance chasers” and had remarked that “Cubans as a whole, whenever anything like this happens, they yell sue, sue, sue, or want to sue at the drop of a hat.” The trial court denied plaintiff’s motion for new trial, apparently relying on the jurors’ assurances that they were not influenced by the comments. The Third District reversed and remanded the case for a new trial because the biased juror’s active participation in the collegial deliberative process effectively deprived the plaintiff of an impartial jury, despite the other jurors’ assurances that they were not influenced by the comments. See also United States v. Heller, 785 F.2d 1524 (11th Cir.1986) (trial court erred in refusing to declare mistrial upon discovering that jurors had made antiSemitic comments).
Singletary argues that the trial court in the instant case, like the trial court in Sanchez, mistakenly inquired about the effect of the “sewing up” comment on the jurors who heard it. According to Singletary, juror Tuten’s comment demonstrated racial bias, and Tuten’s participation deprived Sin-gletary of an impartial jury, thus necessitating a new trial without regard to the effect of the comment on other jurors or the likelihood that the comment affected the verdict.[1]
However, Singletary’s argument ignores the fact that the trial court found no juror misconduct in the form of a comment evidencing racial bias. Thus, whatever inquiry was made concerning the effect upon other jurors can be ignored as unnecessary and irrelevant.
The trial court’s decision on whether to grant a new trial is subject to review for abuse of discretion. State v. Hamilton, 574 So.2d 124, 126 (Fla.1991); Rudolph v. Gleason, 339 So.2d 298 (Fla. 3d DCA 1976), cert. denied, 348 So.2d 952 (Fla.1977); Evans v. Roth, 168 So.2d 546 (Fla. 3d DCA 1964), cert. denied, 174 So.2d *355 32 (Fla.1965). The “sewing up” comment was certainly crude — most would find it offensive — but it was not a racial or ethnic slur that would lead us to conclude that the trial court abused its discretion in failing to order a new trial.
Apparently, Singletary recognizes that the comment at issue did not involve an explicit racial epithet similar to the ethnic slur that required a new trial in Sanchez. Thus, she argues that even without an explicit epithet, the “sewing up” comment suggested “that Mrs. Singletary was a foolish, immoral, promiscuous woman who should have been sewed up to avoid having more children at public expense,” and that such a comment is “consistent with negative, racially based stereotypes of blacks which are unfortunately still prevalent in many parts of the country.” Singletary suggests that if an explicit slur is required, a clever speaker’s choice of words can effectively insulate expression of racial bias from judicial review, and turn the principle of impartial jury trial into a sham.
To ascribe to the comment the volume of meaning suggested by Singletary we would have to ignore the trial court’s acceptance of juror Smith’s account of the remark over that offered by alternate juror Lumpkin. Lumpkin’s account, though not necessarily establishing racial bias, could only be interpreted as disparaging of Singletary. Smith’s account, however, is at least susceptible of an interpretation that is not derogatory toward Singletary. Thus, juror Tuten could have been expressing in crude terms her own inhibition against having a large number of children. Such a comment is hardly flattering to Singletary — perhaps even implying disapproval of Singletary’s reproductive choices — but it is certainly not the type of vile racial slur, veiled or otherwise, that has been characterized by Single-tary. Of course, it would have been better had juror Tuten not found it necessary to share her views on this topic with fellow jurors, but, having done so, we cannot say that the trial court abused its discretion in refusing to grant a new trial based upon the comment.
In affirming the trial court, we do not hold, as suggested by Singletary, that an explicit racial or ethnic slur is always required for this type of juror misconduct to result in a new trial. Although ambiguous comments, like the remark at issue here, are undoubtedly less likely to be deemed misconduct, they are not immune from review by the trial court or by this court. There is no means by which we can peer into jurors’ hearts and minds to see whether such a comment is the product of bias or prejudice. As in the jury selection process, so too with juror misconduct, we must “necessarily rely on the inherent fairness and color blindness of our trial judges who are on the scene and who themselves get a ‘feel’ for what is going on_” Reed v. State, 560 So.2d 203, 206 (Fla.1990). Given the record before us, we cannot say that the trial judge so misperceived the situation that his refusal to grant a new trial constitutes an abuse of discretion.
Accordingly, with the exception of the award of appellate costs to the appellee, we affirm on all issues.
MINER and ALLEN, JJ., concur.
ERVIN, J., dissents with opinion.

. Singletary’s argument raises the question whether it is appropriate to utilize the second part of the Baptist Hospital/Hamilton inquiry (i.e., new trial unless nonmovant demonstrates no reasonable possibility that misconduct affected the verdict) in cases involving a juror's biased comments. Indeed, one could legitimately maintain that the participation of a juror whose bias has been demonstrated by racial, ethnic or religious comments, precludes the court from finding that the comments did not affect the verdict; thus, where juror misconduct is in the form of biased comments, a new trial will be necessary despite any subsequent showing of "harmlessness” by the nonmovant. Such a showing, though relevant when assessing the misconduct at issue in Baptist Hospital (improper consideration of evidence not introduced at trial) and Hamilton (presence of extraneous materials in jury room), may not be relevant to the type of misconduct at issue in the instant case. Of course, this argument is academic given the trial court's conclusion that no misconduct was shown. Such a conclusion obviated the need for further inquiry concerning harmlessness or the extent of the comment's effect upon other jurors, and rendered any findings on such questions mere surplusage.