Rehearing en banc granted, June 15, 2004

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

SHAWN PAUL HUMPHRIES,

*Petitioner-Appellant,*

v.

JON E. OZMINT, Director, South
Carolina Department of Corrections;
HENRY DARGAN MCMASTER,
Attorney General, State of South
Carolina,

*Respondents-Appellees.*

No. 03-14

Appeal from the United States District Court
for the District of South Carolina, at Anderson.
Joseph F. Anderson, Jr., Chief District Judge.
(CA-02-4276-8-17BI)

Argued: December 4, 2003

Decided: May 3, 2004

Before WILKINSON and DUNCAN, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

———————————————————

Affirmed in part; vacated and remanded in part by published opinion.
Judge Wilkinson wrote the opinion, in which Judge Duncan joined,
and in Part IV of which Senior Judge Hamilton joined. Senior Judge
Hamilton wrote an opinion concurring in part and dissenting in part.

———————————————————

## COUNSEL

**ARGUED:** Teresa Lynn Norris, CENTER FOR CAPITAL LITIGA-
TION, Columbia, South Carolina, for Appellant. Donald John

Zelenka, Assistant Deputy Attorney General, Columbia, South Carolina, for Appellees. **ON BRIEF:** Joseph Maggiacomo, CENTER FOR CAPITAL LITIGATION, Columbia, South Carolina; Thomas R. Haggard, Ridgeway, South Carolina, for Appellant. Henry Dargan McMaster, Attorney General, John W. McIntosh, Chief Deputy Attorney General, Columbia, South Carolina, for Appellees.

---

## OPINION

WILKINSON, Circuit Judge:

Shawn Paul Humphries received a sentence of five years for criminal conspiracy, twenty years for attempted armed robbery, and death for the murder of Mendal "Dickie" Smith. After exhausting appropriate state remedies, Humphries filed an unsuccessful habeas petition in federal district court. He claimed that he received ineffective assistance of counsel under the Sixth and Fourteenth Amendments because of his counsel's failure to object to the State's closing arguments at sentencing, which compared the respective worth of the life of the victim to that of Humphries. Humphries also claimed that the State's failure to notify him of the use of victim impact evidence violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. The district court dismissed the petition.

We affirm in part, and vacate and remand in part. The South Carolina Supreme Court reasonably interpreted federal law when it found no constitutional violations concerning the extent of notice about the introduction of victim impact evidence. On the facts of this case, however, we find that the failure of Humphries' counsel to object to the State's extensive and egregious use of comparative human worth arguments amounted to ineffective assistance of counsel. This omission by Humphries' counsel was, on these facts, so unduly prejudicial that it rendered the jury's recommendation of a capital sentence fundamentally unfair. We thus affirm Humphries' convictions, but we vacate the sentence of death and remand to the district court with instructions that the writ be issued solely for purposes of resentencing.

## I.

On August 5, 1994, a jury convicted Shawn Paul Humphries of the murder of Mendal "Dickie" Smith in Fountain Inn, South Carolina. On the morning of January 1, 1994, Humphries, then age 22, and Eddie Blackwell, then age 19, had been drinking beer when they decided to rob a convenience store run by Smith. Humphries flashed a gun he had stolen the night before and demanded Smith's money. Smith appeared to reach under the convenience store counter to get a gun, and Humphries responded by firing a single, fatal shot at Smith. Humphries was successfully prosecuted in South Carolina state court, and a jury convicted him of attempted armed robbery, possession of a firearm during the commission of a violent crime, criminal conspiracy, and murder. On August 9, 1994, Humphries was sentenced to death for murder, twenty years for attempted armed robbery, and five years for criminal conspiracy.

The South Carolina Supreme Court affirmed Humphries' conviction and sentence on direct appeal, and the Supreme Court denied certiorari. *See State v. Humphries*, 479 S.E.2d 52 (S.C. 1996), *cert. denied*, 520 U.S. 1268 (1997). Humphries' application for post-conviction relief in South Carolina state court was dismissed by the Common Pleas Court on December 21, 1998, and his appeal was rejected by the South Carolina Supreme Court on August 26, 2002. *See Humphries v. State*, 570 S.E.2d 160 (S.C. 2002). Humphries then filed for habeas relief in federal district court. The district court dismissed Humphries' habeas petition, but subsequently granted a certificate of appealability for the issues now before this court. *See* 28 U.S.C. § 2253(c) (2000).

## II.

We review de novo a district court's decision on a petition for writ of habeas corpus based on a state court record. *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999); *see also Bell v. Ozmint*, 332 F.3d 229, 233 (4th Cir. 2003). If a state court has resolved the merits of a claim for post-conviction relief, a federal court may not grant a writ of habeas corpus unless the state court's holding "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

In the present case, we focus on the question of whether the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1). A state court decision is contrary to clearly established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision involves an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08.

The requirements Humphries must satisfy in demonstrating an unreasonable application of clearly established federal law under § 2254(d)(1), however, are onerous. As the Supreme Court has recently reiterated,

> "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly. Rather, it is the habeas applicant's burden to show that the state court applied [that case] to the facts of his case in an objectively unreasonable manner."

*Price v. Vincent*, 538 U.S. 634, 123 S. Ct. 1848, 1853 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam) (internal quotations omitted)). Notably, an "'unreasonable application of federal law is different from an incorrect application of federal law.'" *Woodford*, 537 U.S. at 25 (quoting *Williams*, 529 U.S. at 410)) (emphasis in original).

Humphries argues that he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments when his counsel failed to object to the State's closing arguments at sentencing, in which the State compared the general worth of Humphries' life to that of the victim. He also claims that the State's failure to provide notice

that it intended to introduce victim impact evidence in the sentencing proceedings violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment.

## III.

We consider first Humphries' claim of ineffective assistance of counsel. For the reasons explored below, we conclude Humphries has satisfied the foregoing requirements in arguing his counsel rendered ineffective assistance in failing to object to the prosecution's argument for the imposition of the death penalty. The Supreme Court has concluded that a prosecutor may appropriately argue, and a jury may appropriately consider, "victim impact" evidence relating to the victim's personal characteristics at a capital sentence hearing. *Payne v. Tennessee*, 501 U.S. 808, 823 (1991). Recognizing that precedent, the stringent requirements AEDPA places on the grant of federal habeas relief, and mindful of the serious consideration given to this matter by prior courts, we are nevertheless constrained to conclude that, because of the use to which the "victim impact" evidence was put in this case, Humphries is entitled to federal habeas relief under § 2254(d)(1).

## A.

The Supreme Court has laid out a two-part test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant "must show that counsel's performance was deficient." *Id.* at 687. To establish this deficiency, the defendant must produce evidence that the "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688.

Second, the defendant must show that the deficient performance resulted in actual prejudice to his case. A showing of prejudice requires the defendant to prove that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Id.* at 687. In the context of a capital sentencing proceeding, the question is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Prejudice is established in a capital case where the jury is considering both aggravating and mitigating evidence during sentencing if "there

is a reasonable probability that at least one juror would have struck a different balance," but for the constitutional error. *Wiggins v. Smith*, 123 S.Ct. 2527, 2543 (2003).

The *Strickland* standard is a difficult one to satisfy, and for good reason. Counsel must often make instantaneous decisions without the luxury of hindsight that appellate courts, and especially habeas courts, enjoy. *See Truesdale v. Moore*, 142 F.3d 749, 753-54 (4th Cir. 1998). But there are some actions or omissions that are so prejudicial that a reviewing court must necessarily recognize counsel's errors as ineffective assistance. The failure of Humphries' counsel to object to the State's sentencing arguments comparing the overall worth of Humphries' life with that of the victim constitutes such a case of constitutionally deficient representation with a clearly prejudicial effect.

## B.

In his closing arguments, the State's solicitor repeatedly emphasized the comparative worth of the lives of the victim and of the defendant. While the solicitor did not use the actual words "comparative worth" or "value," he insistently and systematically contrasted the apparently virtuous and productive life of the victim with Humphries' allegedly worthless existence, and asked jurors to impose a death sentence on that basis.

The solicitor began his closing arguments by announcing that, in addition to considering mitigating and aggravating evidence, the jury would:

> . . . have evidence about the character of the Defendant to consider. And you're going to have evidence about the victim, Dickie Smith, to consider, because I would submit to you that he is as much a part of this portion of this trial as is Shawn Paul Humphries.

If the solicitor had merely used victim impact evidence to illustrate the "victim's uniqueness as an individual human being," *Payne*, 501 U.S. at 823 (internal quotations omitted), his actions would be beyond scrutiny. The prosecution could further have independently chal-

lenged the character and criminal history of the defendant, and Humphries' counsel would have had no grounds to lodge a sustainable objection.

The problem is that the prosecutor did not stop there. Instead, he drew repeated comparisons between the value and worth of the victim's life and that of the defendant, an argument which any reasonable observer would have found designed to secure a death sentence from the jury. The way in which the victim led his life was contrasted, at identical points in time, with the way the defendant had led his. For example, the solicitor stated that:

> [I]n 1984 [Dickie Smith, the victim] met Pat, and they fell in love, and they got married. That's the same year Shawn Paul Humphries committed two house break-ins at age 13. 1986 Dickie makes a pretty drastic move. He decides he's going to quit Kemet and go build homes full-time, and he goes out, and he starts building homes in the community he had grown up in. That's the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.

> Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaugher — stepsister, said, "Please don't put Shawn Paul Humphries in the electric chair." I'm sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.

> In 1988 Ashley is born. That's the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith, opens the doors to the Max-Saver, building a business in that community.

The State's clear purpose in using this time line was to contrast the life of the victim with the life of the defendant in order to exhort the jury to return a death sentence on the basis of the latter's relative lack of worth. The solicitor emphasized that "Dickie Smith is as much about this case as Shawn Paul Humphries." He rhetorically asked the jury "Who is the victim here, Shawn Paul Humphries or is it Dickie

Smith?" and argued for the death penalty by asking the jury "if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it?" He concluded by telling the jury that, while weighing the evidence of aggravation and mitigation, they should consider that "when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances." This argument was set forth without objection, and the jury, as noted, recommended a sentence of death.

## C.

Victim impact evidence has an important and legitimate place in capital sentencing proceedings. The Supreme Court in *Payne v. Tennessee* has made clear that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne*, 501 U.S. at 827. "A state may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* As its name thus suggests, victim impact evidence allows the jury "a quick glimpse of the life" that a defendant "chose to extinguish"; it demonstrates the full impact of a crime, not only on the victim, but also on loved ones left behind. *Id.* at 822 (internal quotations omitted).

The facts of *Payne* plainly illustrate the use to which such evidence may be put. The case involved the murder of a twenty-eight-year-old mother and her two-year-old daughter whom the defendant viciously stabbed to death with a butcher knife. The *Payne* Court approved the introduction of victim impact evidence concerning the physical and psychological harm inflicted on the victim's three-year-old son who was also stabbed repeatedly, yet survived, and who thus witnessed the murder of his mother and sister.

Yet, while the states plainly "remain free, in capital cases, as well as others, to devise new procedures and new remedies to meet felt needs," *id.* at 824-25, neither *Payne* nor any other Supreme Court case has suggested that victim impact evidence may be used without

limit, constraint, or reference to the harm caused by the crime to those aggrieved. To the contrary, the *Payne* Court clearly limited the introduction and use of victim impact evidence by prohibiting victim impact evidence "that is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825.

In particular, the Supreme Court has disapproved of the use of victim impact evidence to make comparative human worth arguments. The *Payne* Court noted the concern "that the admission of victim impact evidence permits a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823. The Court concluded that:

> As a general matter . . . victim impact evidence is not offered to encourage comparative judgments of this kind— for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be. *Id.* at 823 (emphasis in original).

The *Payne* Court also laid out a framework for drawing the line between the legitimate and illegitimate uses of victim impact evidence. The Court found that "[i]n the majority of cases . . . victim impact evidence serves entirely legitimate purposes." *Id.* at 825. But it concluded that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. Victim impact evidence that emphasizes the harm a murder caused the victim, his family, and his loved ones is unquestionably legitimate. However, the comparative worth argument presented in this case, calling for a death sentence based on the relative value of Sean Humphries' life vis-a-vis Dickie Smith's, falls squarely within the category of prosecutorial conduct that may be so prejudicial that it renders a trial fundamentally unfair.

The South Carolina Supreme Court held that *Payne* only prohibited comparisons between the relative worth of victims, rather than com-

parisons between victims and perpetrators. *See Humphries v. State*, 570 S.E.2d 160, 167-68 (S.C. 2002). It is true that a comparison of one victim to another may differ from a comparison of a victim to a defendant. The former permits the introduction of collateral evidence —the worthiness of other members of society—while the latter invites a commentary on evidence already before the jury. Nonetheless, distinguishing these two types of human worth comparisons splits an awfully thin hair. Both comparisons miss the main point of *Payne*, which is that victim impact evidence must be used to further the traditional purposes of sentencing: namely that a sentence reflect such factors as the nature and severity of the crime, the consequences of the crime upon the unique lives of the victim and his family, or the criminal history of the defendant. To permit a sentence of death to be returned on the explicit and pointed comparative worth argument in this case pushes *Payne* so far that the major objective of victim impact evidence is lost, which is "informing the sentencing authority about the specific harm caused by the crime in question." *Payne*, 501 U.S. at 825. This focus on the consequences of the crime ensures that victim impact evidence promotes rather than retards the fundamental purposes of the sentencing function. *See id.* at 820 (noting that the objective of the Sentencing Guidelines is to calibrate sentences "to the subjective guilt of the defendant and to the harm caused by his acts").

It is undeniable that "'[t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.'" *Payne*, 501 U.S. at 825 (quoting *Booth v. Maryland*, 482 U.S. 496, 517 (1987) (White, J., dissenting)). The State here claimed that its comparisons between the victim and the defendant merely advanced this legitimate purpose and served as nothing more than a comment on the evidence. The dissent notes that the sentencing proceeding included evidence about both the victim's unique life and the perpetrator's at-risk childhood and subsequent criminal acts. *See Humphries v. State*, 570 S.E.2d 160, 167-68 (S.C. 2002). It stresses that all of the solicitor's arguments were based on evidence that was properly included in the record. *Id.*

We do not at all suggest this evidence was inadmissible. The state court properly admitted the victim-impact evidence. Our fine dissent-

ing colleague notes the testimony of Randy and Pat Smith, Dickie's brother and wife. But we have found no error in the admission of their testimony. Much of the solicitor's closing argument also conformed to the strictures of *Payne*. That the facts from which the prosecutor drew his comparison were already in the record, however, does not cure the prejudice resulting from the format in which the prosecutor chose to present a significant portion of his close. The comparison between the victim and perpetrator that formed the focus of closing argument reached the point at which differences in degree ripen into differences in kind. The State did not simply seek to explore the tragic consequences of this crime for the victim's family and community or to lay out the victim's uniqueness as an individual. Nor was its argument confined to addressing the defendant's past criminal record or history. Rather, it sought, point-by-point and year-by-year, to demonstrate to the jury unambiguously that at the very instant one life was being put to good use, the other was not. This side-by-side comparison of the relative value of two lives was calculatedly incendiary and rendered the sentencing fundamentally infirm.

We recognize that many capital sentencing proceedings are going to focus upon the persons of the victim and the perpetrator. This is especially true since *Payne* approved many uses of victim impact evidence. It may be to the advantage of the defendant to portray the victim of the offense unsympathetically, and it may be to the advantage of the prosecution to paint the victim and his family in a feeling manner and to cast doubt on the defendant's mitigating evidence. All of this is well within the bounds of permissible argument. But *Payne* warns against the type of argument in support of the death penalty based on comparative human worth employed here. *See Payne*, 501 U.S. at 825. To argue that a murderer merits mercy because he killed "only" a prostitute or drug user, rather than a philanthropist, would strike us as profoundly lawless. Similarly, to argue that a defendant should be sent to death because his life was of less value than his victim is to ask a jury to decide, not on the character of the crime, not on the consequences of the crime, not on the criminal record of the perpetrator of the crime, but on some unfettered evaluation of human worth that works improper prejudice.

The words "Equal Justice Under Law" are engraved over the entrance of the United States Supreme Court as a symbol of the law's

commitment to treat all litigants as individuals of equal dignity. *See Lyng v. Castillo*, 477 U.S. 635, 636 n.2 (1986). This individuality is compromised, however, when prosecutors implore juries to hand down death sentences on theories of comparative human worth. The past lives which this jury was exhorted to balance bore no connection or relation, save for the tragic events surrounding Dickie Smith's murder, and yet the State engaged in sweeping comparisons of both. The very concept of a sentence should have operated to preclude the comparison. One does not receive a sentence for leading a less valuable life than someone else. One receives a *sentence* under our system for having committed a *crime*.

This is certainly the view of the Supreme Court, which has described victim-impact evidence as but another means of "informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities." *Payne*, 501 U.S. at 825. By contrast, the comparative worth argument relied on here ranged far afield and fell within the category of factors that the Supreme Court has prohibited as unduly prejudicial in the death penalty sentencing context. *See Johnson v. Mississippi*, 486 U.S. 578, 584-85 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 885 (1983)) (prohibiting death penalty decisions "predicated on mere 'caprice' or on 'factors that are constitutionally impermissible or totally irrelevant to the sentencing process'"). The comparison of what Humphries and Smith happened to be doing in 1984 or 1986 or 1988 or at some fortuitous past point in their separate lives is the essence of an arbitrary and capricious circumstance. That Dickie Smith happened to be building houses while Shawn Paul Humphries happened to be breaking into houses is a judgment freighted with comparative moral import. It was not, however, a permissible basis under the Due Process Clause on which to condemn the defendant to death. Juries are free to mete out capital verdicts based on the evidence before them, the consequences of the crime for the victim's family and loved ones, the presence or absence of a variety of aggravating or mitigating circumstances, or the sheer heinousness of the offense. *See, e.g.*, South Carolina Code § 16-3-20(C). All of these factors are focused on the individuals qua individuals and are not comparative in nature. But one thing the centerpiece of closing argument cannot invite is a sentence on the basis that one person is of more intrinsic value than someone else. *Payne*, 501 U.S. at 823. A

defendant may not be condemned simply for being deemed, over the long trajectory of life, a less estimable human being than his victim.

This sort of comparison is foreign to most sentencing regimes. In the wake of *Payne*, the federal government, the military, and thirty-three of the thirty-eight states with the death penalty have authorized the use of victim impact evidence in capital sentencing. John H. Blume, *Ten Years of* Payne: *Victim Impact Evidence in Capital Cases*, 88 Cornell L. Rev. 257, 267 (2003). Unsurprisingly, while these jurisdictions allow a broad range of victim impact evidence, none sanctions the sort of comparative worth arguments advanced in this proceeding. To place the matter in perspective, the United States Sentencing Guidelines contemplate a multitude of enhancements and departures for factors such as the knowing selection of a vulnerable victim, U.S.S.G. § 3A1.1, the perpetrator's aggravating role in the offense, U.S.S.G. § 3B1.1, the abuse of a position of trust or use of a special skill in committing the offense, U.S.S.G. § 3B1.3, the infliction of significant physical or extreme psychological injury on the victim, U.S.S.G. § 5K2.2, 5K2.3, the use of a weapon or dangerous instrumentality in the commission of the crime, U.S.S.G. § 5K2.6, and the crime's purpose of facilitating or concealing another offense, U.S.S.G. § 5K2.9. One can look in vain among these enhancements and departures for any factor remotely resembling the relative worth of the victim's and defendant's lives. Such a factor would hardly form the basis of a two-level increase, much less the imposition of a sentence of death. If we ignore *Payne*'s condemnation of the use of comparative human worth arguments, we invite future abuses. As the trial judge exclaimed, this was "one of the best arguments I have ever heard in my life given in a closing argument . . . in terms of the technique, . . . delivery, effectiveness." The argument was so effective, however, precisely because it was so improperly prejudicial to Humphries, and ignored the bedrock premise that "punishment should be directly related to the personal culpability of the criminal defendant," *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring).

A number of state courts have recognized the dangers of indulging arguments contrasting the human worth of a victim and a defendant. *See, e.g.*, *State v. Koskovich*, 776 A.2d 144, 182 (N.J. 2001) (holding that "the court's directive to jurors that they balance the victim's

background against that of defendant was akin to asking the jury to compare the worth of each person," which is "inherently prejudicial" and "might prompt jurors to impose the death penalty arbitrarily"); *State v. Muhammad*, 678 A.2d 164, 179 (N.J. 1996) ("Victim impact testimony may not be used . . . as a means of weighing the worth of the defendant against the worth of the victim."); *State v. Storey*, 901 S.W.2d 886, 902 (Mo. 1995) (en banc) (finding ineffective assistance of counsel because of the failure to object to prosecutor's arguments: "Whose life is more important to you? Whose life has more value? The Defendant's or [the victim's]?"). We recognize that our own review here is on collateral attack. However, the fact that the State can point to no court that has sustained an argument like the instant one bears on the question of whether the state court's adjudication was a reasonable one in light of the controlling Supreme Court precedents. The State can only point to two cases which purport to reconcile *Payne* with comparative worth arguments. *See State v. Haselden*, 577 S.E.2d 594, 610 (N.C. 2003) (upholding a prosecutor's argument that compared the worth of the victim and defendant); *Jackson v. State*, 33 S.W.3d 828, 843 (Tex. Crim. App. 2000) (upholding an argument encouraging the jury not to impose a life sentence, which compared the defendant's importance to the victim's). These two cases are distinguishable inasmuch as the comparisons between the victims and defendants were nowhere near as extensive or egregious as in this case, which stands alone in its resort to the year-by-year chronology of two lives for the sole purpose of drawing an invidious comparison between them.

### D.

Humphries' counsel should have known that the State's comparative worth arguments were constitutionally infirm and objected accordingly. Yet neither of Humphries' two counsel objected to the State's comparative worth arguments at trial. They did lodge a general challenge to the admissibility of victim impact evidence without prior notice, which they reserved for appeal. But they were remarkably silent during the comparative worth arguments, and admitted after trial that their failure to object constituted ineffective assistance of counsel.

This court must of course "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional

assistance." *Truesdale v. Moore*, 142 F.3d 749, 753-54 (4th Cir. 1998). But the State's comparative worth arguments, which were at once without precedent and at odds with traditional precepts of due process, should have struck those learned in the law like a bucket of ice water. The failure of Humphries' counsel to object to these arguments fell "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and was constitutionally deficient.

Moreover, the State's comparative worth arguments were sufficiently prejudicial that they rendered the sentencing "fundamentally unfair." *Payne*, 501 U.S. at 825. These forms of arguments represent the types of appeals to jurors that the Supreme Court has long condemned in the death penalty context. The Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings v. Oklahoma*, 455 U.S. 104, 118 (1982) (O'Connor, J., concurring). And "[i]t is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion). Given the force of the comparative worth arguments made by the State at the critical juncture of the prosecution's closing argument, we safely conclude that "there is a reasonable probability that at least one juror would have struck a different balance," but for the constitutional error. *Wiggins v. Smith*, 123 S.Ct. 2527, 2543 (2003).

Respecting, as we do, the strictures of the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), we must nonetheless vacate the sentence. Our holding, however, remains a narrow one. We appreciate that closing arguments pack emotional punch. We recognize the undesirability of requiring counsel to lodge frivolous or counterproductive objections and the desirability of affording each side at a capital sentencing proceeding the latitude of an uninterrupted close. We acknowledge that the standards for the submission of evidence in sentencing are permissive, *see State v. Gulledge*, 487 S.E.2d 590, 594 (S.C. 1997), and that much of the State's attempt to underscore the impact of the loss of this exemplary citizen's life upon his family and friends was permissible under *Payne v. Tennessee*. And

we emphasize yet again that the failure to object here was not to general, oblique, or inadvertent comparisons of victim and defendant, which may be almost inescapable in light of the *Payne* decision. Rather the failure to object pertained to a year-by-year, side-by-side chronology of two past lives with the sole objective of comparing the worthiness and value of them. It was this explicit resort to notions of relative human worth unrelated to the crime at issue that traduced basic standards of due process. The failure of Humphries' counsel to object to these arguments fell below the *Strickland* threshold, clearly prejudiced the defendant, and compromised the jury's recommendation of death.

IV.

Humphries raises an additional claim which bears on his trial and resentencing. He asserts that the State's failure to notify him of the use of victim impact evidence during sentencing violated his right to a fair trial under the Due Process Clause of the Fourteenth Amendment. Humphries also asserts that his counsel reasonably believed at the time of the trial that South Carolina Code § 16-3-20(B) entitled Humphries to receive advance written notice of aggravating factors that would be used at trial, which implicitly included victim impact evidence. Humphries' counsel claim that they prepared for trial on the assumption that victim impact evidence was not going to play a role at any phase of the proceeding. If they had known that victim impact evidence would be used, they would have selected jurors differently, reconfigured an expert witness's testimony, and conducted a more thorough investigation of the victim's background.

To begin with, Humphries cannot raise a state law issue in a federal habeas petition, which exists for the purpose of redressing unconstitutional detentions. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not lie for errors of state law."). He seeks to avoid this difficulty by contending that the South Carolina statute at issue is really nothing more than an expression of federal due process principles. Even if we were to accept this contention, however, Humphries' claim would still fail.

South Carolina Code § 16-3-20(B) provides that at the sentencing phase of a capital trial, "[o]nly such evidence in aggravation as the

State has informed the defendant in writing before the trial is admissible." The South Carolina Supreme Court on direct appeal noted that the statute lists certain aggravating factors requiring notice. Victim impact evidence is not listed as an aggravating factor and therefore presumptively does not require notice. *See State v. Humphries*, 479 S.E.2d 52, 55 (S.C. 1996).

Even if the statute did somehow require notice of victim impact evidence before trial, Humphries received written notice that the State intended to introduce certain facts in evidence including "all circumstances surrounding the commission of these crimes." At the trial itself, the State listed the victim impact witnesses on its witness lists, and the State asserted that it had clear discussions with the defense about presenting victim impact evidence only during the sentencing phase of the trial.

The notice could certainly have been more explicit concerning the planned introduction of victim impact evidence, but the State was not obligated under either the South Carolina statute or the Due Process Clause to detail the victim impact evidence with greater specificity. As the South Carolina Supreme Court found: "Capital defendants are as free as the State to gather information relating to the characteristics of the murder victim, and, therefore, generally have a fair and complete opportunity to respond to the State's factual allegations." *State v. Humphries*, 479 S.E.2d at 55. Humphries had the opportunity to gather and present information to rebut the victim impact evidence. The fact that he hired a private investigator to explore the victim's background suggests that he did in fact avail himself of this opportunity.

Humphries similarly claims a due process violation because "the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977). He asserts this occurred because he allegedly did not receive proper notice concerning the introduction of victim impact evidence and, therefore, could not adequately prepare his defense in advance. This claim fails for many of the same reasons as the prior one. Humphries knew or reasonably should have known that victim impact evidence would be used by the State during the sentencing proceedings. He thus had ample opportunity to investi-

gate and rebut that evidence. As the district court found, there is no law that clearly requires timely, specific, and express notice of victim impact testimony, and Humphries can point to no pertinent federal authority to substantiate his claim. The South Carolina Supreme Court thus reasonably interpreted federal law to find that the admission of victim impact evidence did not violate his right to a fair trial under the Due Process Clause of the Fourteenth Amendment.

## V.

Capital trials in our federal system must remain largely the province of the states. And victim impact evidence has many good and legitimate uses, among them awakening juries to the tragic toll of serious crime. But the comparison here was an abuse of this powerful prosecutorial tool, an abuse which no reasonable attorney would sit and greet with silence. It should not need saying that in our country capital sentences do not rest on the scales of relative human worth.

We affirm petitioner's convictions. We vacate his sentence of death, and remand with directions that the writ issue solely for purposes of resentencing.

*AFFIRMED IN PART;*
*VACATED AND REMANDED IN PART*

HAMILTON, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with the court that the state's failure to notify Shawn Paul Humphries (Humphries) of its intended use of victim-impact evidence during the sentencing phase of the trial did not violate Humphries's right to a fair trial under the Due Process Clause of the Fourteenth Amendment. I also agree with the court's conclusion that Humphries's sentence was not imposed, at least in part, on the basis of information he had no opportunity to deny or explain in violation of *Gardner v. Florida*, 430 U.S. 349 (1977). Accordingly, I concur in Part IV of the court's opinion. However, because I cannot agree with the majority's conclusion that the South Carolina Supreme Court unreasonably applied *Payne v. Tennessee*, 501 U.S. 808 (1991), in

rejecting Humphries's claim that he received constitutionally ineffective assistance of counsel when his counsel failed to object to a portion of the solicitor's closing argument, I respectfully dissent from the majority's decision granting the writ of habeas corpus solely for the purpose of resentencing Humphries.

I

Before I begin my analysis, it is helpful to set forth the background facts surrounding the *Payne* issue. During the sentencing phase of the trial, the solicitor proffered, and the state trial court admitted, all of the evidence that was admitted during the guilt phase of the trial. Following the court's admission of this evidence, the solicitor called two witnesses from Dickie Smith's family, his brother Randy Smith and his wife Pat Smith. These witnesses testified about Dickie Smith's childhood, upbringing, work ethic, generosity, and close relationship with his young daughter Ashley.

Randy Smith testified that he and Dickie Smith grew up in a poor family and they did not have hot water. When Dickie Smith was nine-years old, his father died. After his father's death, Smith and the other family members began working to support the family. Randy Smith testified that when Dickie Smith was in the ninth grade, he took a job as a meat cutter at Bi-Lo after school, working until 10:00 or 11:00 p.m. at night. In the tenth grade, Dickie Smith acquired a full-time job working second shift in a textile mill while continuing to attend school. Randy Smith testified everyone in the community liked Dickie Smith and he was a good person.

During her testimony, Pat Smith described Dickie Smith as ambitious, hardworking, and generous. For instance, after receiving one technical degree and becoming a supervisor, Dickie Smith went back to school to get his residential home builder's license and began building houses in 1986. Ashley was born in 1988. Pat Smith described Dickie Smith and Ashley's relationship as very close and testified that Ashley was having a hard time since her father was killed and was receiving counseling.

Following this testimony, the state moved to admit a photograph of the crime scene and documentary evidence demonstrating that Hum-

phries was adjudicated as delinquent in 1985 for two breaking and enterings, convicted in 1989 in Anderson County, South Carolina of burglary and larceny, and convicted of larceny in Alabama in 1990.

In terms of making a case in mitigation, Humphries's strategy was four-fold. First, he sought to establish that there was no intent to kill by demonstrating that: (1) he pulled the trigger after he panicked in reaction to Dickie Smith's attempt to reach under the counter; (2) he did not kill Donna Brashier who was also in the store during the shooting; (3) he drove off without Eddie Blackwell; and (4) he voluntarily confessed to the killing. Next, Humphries sought to demonstrate that he was a nonviolent person who had no significant history of engaging in violent acts. He also sought to show that he was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, Humphries sought to show that he was a trustworthy, respectful, and pleasant person.

In support of this strategy, Humphries called thirteen witnesses. The first witness was Albert Humphries, Humphries's paternal grandfather. He testified that Humphries and his brother, Richard Humphries, lived with him and Humphries's grandmother from the time Humphries was three-years old until Humphries was twelve-years old. Albert Humphries testified that he and his wife were heavy drinkers and that his wife grew marijuana in their backyard. Albert Humphries described his son, Humphries's father, as unpredictably violent, noting that he had been to prison several times. Albert Humphries testified that his son had cut him on the arm with a knife and had kicked Humphries's grandmother in the face, knocking her false teeth out.

Patricia Goode, Humphries's aunt, testified that Humphries's father had said on numerous occasions that he never loved his children and that the children should have been aborted.

Humphries's mother, Carla Scott (Scott), testified that, after she left Humphries's father, she became pregnant with Humphries as a result of his father raping her at knife point. She stated that she eventually left the children with their paternal grandparents and married several more men. She reunited with the children only after she married someone who would allow the children to live with her. Scott

also discussed Humphries's criminal record. According to Scott, Humphries was arrested in 1984 for two counts of breaking and entering and was placed on probation. Thereafter, he was given more probation after he was suspended from school for fighting several times. After Humphries's second probation revocation when he was fifteen years old, he was sent to a state facility in Columbia for thirty days and was placed on probation again. Humphries was arrested in January 1989 for breaking into a church, apparently looking for food because he had been living on the street for a week. Humphries pled guilty to that charge and was placed on probation. In 1990, Humphries was charged in Alabama with stealing an automobile. As a result of that charge, Humphries was sentenced to two years' imprisonment followed by four years of probation.

Debbie Humphries, Humphries's step-mother, testified that Humphries's father used a combination of alcohol, drugs, and paint fumes every day and had shared those substances with Humphries from 1983 to 1992. Richard Humphries, Humphries's brother, testified regarding the circumstances in which he and Humphries grew up, including: (1) their father's violence toward his own parents; (2) the lack of hot water and sometimes running water; (3) the lack of food; and (4) the trips taken to the dumpsters to find school clothes.[1]

Preston Taylor testified that, when he was employed by the Department of Youth Services, he had numerous contacts with Humphries, who was thirteen at the time. According to Preston Taylor, Humphries was a pleasant, respectful, cooperative, and nonviolent boy.

Mary Shults (Shults), an expert witness with a degree in sociology and a master's degree in social work, testified regarding Humphries's social history. She related that Humphries had been reminded throughout his life that he was a product of rape. Shults stated that Humphries's father was incredibly violent, would kick people in the face, cut people, and would refer to himself as Satan. In addition,

---

[1] The unfortunate circumstances of Humphries's upbringing were further confirmed by the testimony of two other witnesses, Ruby Badsen, Humphries's maternal grandmother, and Lindsay Badsen, Humphries's uncle.

Shults testified Humphries's father introduced Humphries to drugs and alcohol sometime between the ages of six and ten.

Humphries's case in mitigation was closed with the testimony of three witness, two family friends (Tammy Compton and David Shaw) and his step-sister, Jamie Scott. Tammy Compton testified she trusted Humphries enough to leave her children with him and David Shaw testified Humphries was a good, nonviolent person. Jamie Scott testified she loved her step-brother a lot and wanted to see the jury return a life sentence.

Before the state trial court gave the jury its final instructions, the solicitor and counsel for Humphries gave their closing arguments. In his closing argument, the solicitor broke his argument down into four parts, commenting to the jury that

> [y]ou look at four things in deciding the issue of punishment. You look at the aggravation. Is it an aggravated murder? You look at the character of the Defendant. You look at any mitigation, statutory mitigation or other mitigation they've presented to you. And the last thing you look at is the victim, his uniqueness. What harm to the community and to the victim and to the family did this Defendant cause? Those are the four things you look at.

The solicitor then turned his attention to the evidence in aggravation. The solicitor argued that the evidence in this case clearly established the statutory aggravating circumstance relied upon by the state, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon. Then, the solicitor turned to Humphries's character and summarized Humphries's checkered past in great detail, stating:

> He's been in trouble since he was 13 years old. When he was 13 years old, he committed two breaking and enterings, and he was given probation. He was given a chance by the Family Court judge at age 13.

> He missed school. He got in fights at school. He got suspended at school. He ran away. And so they brought him

back in at age 14 on a probation revocation, and he was given yet another chance, stricter conditions. And again, he skipped school. He ran away. He was disruptive in school. He got suspended.

So at age 15 he's brought back in for another probation revocation. And this time the Family Court Judge said, "You know, enough is enough. We're going to send you down to Columbia. We're going to send you down there [to] see if we can't figure out what makes you tick."

And they do all kind[s] of psychological reports and things that I'll talk about in just a moment. And he comes back, and at age 16 is an habitual truant, and he basically drops out of school, and at age 17 he burglarizes the church and steals from the church, and he's given probation.

And at age 18 he goes to Alabama, and he's convicted of larceny down there, and he's sent to jail for two years. And he gets out when he's age 20, and at 21 he fails to report. They issue a warrant for him. He's still on probation. And at age 22 he commits a murder and attempted armed robbery.

The solicitor then addressed the evidence in mitigation presented by Humphries. The solicitor argued to the jury that there was a complete lack of mitigating evidence, arguing that Humphries had a significant history of prior criminal convictions for crimes of violence and that his relatively young age (twenty-two), mental capacity, and occasional drug and alcohol use were of no moment.

Finally, the solicitor turned to Dickie Smith's uniqueness as an individual. In this regard, the solicitor stated:

Dickie Smith was born in 1950, fourth son, fifth child of a fellow named Alton Smith and a sweet lady named Lottie Mae Darnell Smith. They grew up poor. They didn't have hot water. They had a spigot coming in and a tub next to the stove, and they had a few acres of cotton.

Dickie Smith is as much about this case as Shawn Paul Humphries. When Alton Smith died when Dickie was nine, he pulled himself up by his bootstraps and he started contributing to the family. He got all kinds of odd jobs picking cotton at a penny a pound, hunting rabbits, skinning them, dressing them out, selling them for 50 cents.

When he's 14 years old, he gets a job in Greenville at the Bi-Lo in the Meat Department working after school. He's gone to school all day. From after school til about 10:00 or 10:30 at night working at Bi-Lo, saving his money, buying a car for the family.

When he's in tenth grade, he goes down to Boenett's and he gets a full-time job, second shift. He's going to school all day, and he's working until midnight, contributing. Lottie Mae Darnell Smith with eight kids, got them all out of high school, all at least a tech degree, some of them through college.

When Dickie Smith finished high school, he went to work for Union Carbide, then Kemet, but he didn't stop there. He kept improving himself. He went to Tech, he got an engineering degree, and he became a supervisor, and then he went back to Tech because he decided he wanted to build houses, and he got his—another degree at Tech, and he got his builder's license.

And in 1984 he met Pat, and they fell in love, and they got married. That's the same year Shawn Paul Humphries committed two house break-ins at age 13. In 1986 Dickie makes a pretty drastic move. He decides he's going to quit Kemet and go build houses full-time, and he goes out, and he starts building homes in the community he had grown up in. That's the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.

Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaughter—stepsister, said, "Please don't put Shawn

Paul Humphries in the electric chair." I'm sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you.

In 1988 Ashley is born. That's the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith opens the doors to the Max-Saver, building a business down in that community.

You have the right to look at the uniqueness of the individual. I would submit to you that Dickie Smith, by everybody's description to you was a unique individual. He grew up in that southern part of Greenville County below Simpsonville that was mainly farming, cotton, agriculture area.

And he grew up watching it change to industrial. And he first went to work for one of the industries at Union Carbide, and then he decided he was going to be part of that change, and he started building houses down there and building a business down there.

After finishing the portion of his closing argument concerning Dickie Smith's uniqueness, the solicitor then concluded his argument by arguing the following to the jury:

Who is the victim here, Shawn Paul Humphries or is it Dickie Smith? Who is the victim? Is it this guy over here or is it Donna, Donna Brashier, who's got to hear that gunshot every day of her life and who's got to see Dickie Smith laying on the floor every day of her life?

Who is the victim? Is it this Defendant or is it this lady right here, his momma, or his wife, or Ashley, who the only way she can see her daddy is to go visit his grave on Sunday after church?

There are a lot of reasons for punishment. Rehabilitation is one reason, and rehabilitation is a proper goal in some circumstances, but you've got to decide about whether this

Defendant, who at 13 is breaking the law, at 14 is breaking the law, at 15 is breaking the law, at 17 is going—is breaking the law, at 18 is breaking the law and going to jail, who's been given every chance that the system offers. You decide if you're going to rehabilitate him.

What are some other reasons for punishment? Retribution is a reason for punishment. That may not sound good, may not sound right, but, in fact, it is part of punishment, because retribution is our community saying you have done something wrong and we're going to punish you. . . .

When you look at a case like this, when you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances. . . .

What punishment do you recommend when a man is defending his co-worker, he's defending his store, he's defending what he has built, and he's ducking behind the counter, and somebody takes a nine millimeter and executes him? What punishment do you recommend? What punishment do you recommend when you've got a character like that? What punishment do you recommend when somebody like Dickie Smith is taken from us?

If not now, then when? If not in a case that's as aggravated as this, then when do you do it? The defense may say, "Well, you can think of all kinds of aggravating cases." You can think of this and you can think of that. You look at the circumstances of this case.

If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken, then when are you going to do it? It's not

supposed to be easy. It's never been easy. It won't be easy in the future.

Shawn Paul Humphries comes into this courtroom asking you for mercy. Shawn Paul Humphries comes in here and asks you for mercy, and I ask you what mercy did he give? Shawn Paul Humphries comes in here and asks you for mercy, and he gave none. Shawn Paul Humphries comes in here and asks you for life, and he gave death. Is that fair? Is that justice? That's what you're here for is justice. It's up to you.

In his closing argument, counsel for Humphries argued that the death penalty was unwarranted for several reasons. First, counsel for Humphries emphasized that there was no evidence of an intent to kill because Humphries: (1) pulled the trigger after he panicked in reaction to Dickie Smith's attempt to reach under the counter; (2) did not kill Donna Brashier; (3) drove off without Blackwell; and (4) voluntarily confessed to the killing. Counsel also argued that Humphries was a nonviolent person who had no significant history of engaging in violent acts. Counsel argued that Humphries was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, counsel argued that Humphries was a trustworthy, respectful, and pleasant person.

Following the state trial court's instructions and the jury's deliberations, the jury recommended a sentence of death. At the post-trial motions hearing, Humphries's counsel objected to the solicitor's use of comparisons between Dickie Smith and Humphries during his closing argument, and the state trial court overruled the objection.

On state habeas, Humphries claimed that his trial counsel were constitutionally ineffective for failing to object to the solicitor's closing argument, which he claimed was inappropriate and prejudicial under *Payne*. The state habeas court rejected this claim because, in the court's view, there was no reference to the comparative worth of Dickie Smith and Humphries. The court further noted that *Payne* actually encourages the prosecution to comment on evidence on record about the life of the victim and about the life of the defendant. Because there was no showing the argument was improper, the court

concluded that counsel for Humphries could not be deemed ineffective for failing to object to the solicitor's closing argument. Humphries appealed the denial of state habeas relief to the South Carolina Supreme Court, and that court denied relief, concluding that Humphries's counsel was not constitutionally ineffective for failing to object to the solicitor's closing argument because the solicitor's argument was not improper under *Payne* and did not render the sentencing phase of Humphries's trial fundamentally unfair.

## II

Our standard for collateral review of a state court's decision on the merits under 28 U.S.C. § 2254(d) is well-settled. A federal court may not grant a writ of habeas corpus unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established Federal law," *id.*, "refers to the holdings, as opposed to the dicta, of the [Supreme] Court's decisions as of the time of the relevant state-court decision." *Booth-El v. Nuth*, 288 F.3d 571, 575 (4th Cir.) (internal quotation marks omitted), *cert. denied*, 537 U.S. 959 (2002). Further, a state court's decision is "contrary to" clearly established federal law, as determined by the Supreme Court, either: (1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Finally, "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Notably, an "unreasonable application of federal law is different from an incorrect application of federal law," because an incorrect application of federal law is not, in all instances, objectively unreasonable. *Id.* at 410.

## III

The principal question before this court is whether the South Carolina Supreme Court unreasonably applied *Payne* to the facts of this

case. To properly analyze this question, we must take a close look at the Supreme Court's precedent concerning victim-impact evidence.

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that the Eighth Amendment prohibits a state from allowing a capital sentencing jury to consider victim-impact evidence. *Booth* involved the brutal murders of an elderly couple, Irvin and Rose Bronstein. *Id.* at 497. During the sentencing phase of the trial, the prosecutor read a victim-impact statement that was compiled by a probation officer on the basis of her interviews with the Bronsteins' surviving family members. *Id.* at 498-500. The victim-impact statement included all three forms of victim-impact evidence: accounts of the emotional and psychological impact of the crime on the family, descriptions of the Bronsteins' personal characteristics, and the victims' family members' opinions and characterizations of the crimes and the defendant. *Id.* at 499-500.

In *Booth*, the Court held that all three forms of victim-impact evidence are irrelevant to a determination of whether to impose a death sentence, and that their admission thus risks arbitrary and capricious imposition of the death penalty. *Id.* at 502-03. The Court noted that, because victim-impact evidence includes facts about which the defendant was unaware at the time of the murder, it is unrelated to the defendant's culpability. *Id.* at 505. The Court further noted that admitting victim-impact evidence would yield arbitrary results because victim-impact evidence would lead juries to impermissibly base their decision on their evaluation of the relative worth of the victim, and because the capital sentencing decision would partially depend upon the degree to which the victim's family members—if the victim leaves any behind—are able to articulate their loss. *Id.* at 505-06. Moreover, the Court stated that victim-impact evidence improperly shifts the jury's focus from the defendant to the victim, and, thus, yields death sentences based on emotion rather than reason. *Id.* at 507-08.

In *South Carolina v. Gathers*, 490 U.S. 805 (1989), the Supreme Court extended *Booth* to cover a prosecutor's comments on the murder victim's personal characteristics. *Id.* at 811-12. In that case, in an attempt to enable the jury to more fully comprehend the human loss involved in the murder of a mentally unstable homeless man, the

prosecutor made various references in his closing argument at the sentencing phase about the victim's personality and character, including inferring from the victim's possession of religious articles and a voter registration card that the victim was a man of faith who cared about his community, reading a prayer written by the victim that was found at the murder scene, and noting that the victim had mental problems. *Id.* at 808-10. The Court found that the prosecutor's statements were "indistinguishable in any relevant respect from that in *Booth*" and, thus, likewise violative of the Eighth Amendment. *Id.* at 811. According to the Court, while victim-impact evidence relevant to the circumstances of the crime is admissible, the prosecutor's statements went far beyond those facts. *Id.* at 811-12.

In *Payne*, the Court overruled both *Booth* and *Gathers*. The *Payne* case involved a brutal attack of a mother and her two small children that left the mother and one of her children dead. *Payne*, 501 U.S. at 812-13. At the sentencing phase of the trial, the prosecutor presented the testimony of the children's grandmother, who testified about the effect of the crimes on the now-orphaned child. *Id.* at 814-15. Additionally, the prosecutor commented extensively on the impact of the murders on the orphaned child and said that the child will "want to know what type of justice was done" when he is older. *Id.* at 815.

In the *Payne* decision, the Court observed that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.* at 825. Furthermore, the Court observed that *Booth* "unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,'" *id.* at 822 (quoting *Mills v. Maryland*, 486 U.S. 367, 397 (1988) (Rehnquist, C.J., dissenting)), or "demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide." *Id.* Consequently, the Court concluded that, "if the State chooses to permit the admission of victim-impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827. Of note, the *Payne* Court did not alter *Booth*'s holding that admitting evidence of the victims' opin-

ions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment; rather *Payne* only allows evidence of the victim's personal characteristics and the harm inflicted upon the victim's family and community. *Id.* at 829 n.2. The Court in *Payne* noted that there was "no reason" to treat victim-impact evidence "differently than other relevant evidence," *id.* at 827, but cautioned that, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825.

IV

In its decision on state habeas, the South Carolina Supreme Court first held that *Payne* only prohibited comparisons between the victim and other members (victims) of the community. *Humphries*, 570 S.E.2d at 167-68. Because no such victim-to-victim comparison was made in the case, the South Carolina Supreme Court held that *Payne* did not *ipso facto* prohibit the solicitor's closing argument. *Id.* Because *Payne* did not specifically prohibit victim-to-defendant comparisons, the South Carolina Supreme Court went on to address the question of whether the solicitor's comments rendered Humphries's sentencing proceeding fundamentally unfair. The court held:

> In our opinion, the solicitor's closing argument did not render sentencing fundamentally unfair as they did not prejudice Petitioner. The solicitor's comments were based on evidence already in the record. Smith's wife and brother testified during the penalty phase regarding each of the facts about Smith's life upon which the solicitor commented. Petitioner presented the testimony of thirteen witnesses in mitigation during the sentencing phase who attested to Petitioner's at-risk childhood and subsequent criminal acts as a juvenile and young adult, providing all the evidence of Petitioner's character discussed by the solicitor in his closing.
>
> Through the testimony of Petitioner and Smith's family members, both the similarities (the childhood poverty and adversity) and the differences (the manner in which Petitioner and Smith dealt with their circumstances) were read-

ily apparent to the jurors, before the solicitor's closing argument. As permitted by *Payne*, the State offered evidence of Smith's "uniqueness" as an individual by describing the successful ways in which Smith dealt with adversity in his life. Likewise, Petitioner introduced evidence of his own "uniqueness" through the testimony of thirteen witnesses (compared to Smith's two witnesses) regarding his own difficult childhood and background, thereby inviting a comparison between Petitioner and Smith's respective characters even before the solicitor gave his closing remarks. As such, we do not believe the solicitor's comments were so prejudicial (if prejudicial at all) that they rendered Petitioner's death sentence fundamentally unfair under the Due Process Clause.

*Humphries*, 570 S.E.2d at 167-68.

V

Turning to the question of whether the South Carolina Supreme Court unreasonably applied clearly established federal law as determined by the United States Supreme Court, initially it should be noted that the Court in *Payne* did not set the parameters of what type of victim-impact evidence would render a trial fundamentally unfair under the Due Process Clause of the Fourteenth Amendment. As noted earlier, the *Payne* Court did observe that courts should handle the admission of victim-impact evidence just like any other relevant evidence. 501 U.S. at 827. However, the only inkling in *Payne* on the limitations imposed on the admission of victim-impact evidence is the Court's citation to *Darden v. Wainwright*, 477 U.S. 168 (1986). *Payne*, 501 U.S. at 825.

In *Darden*, the Court addressed prosecutorial misconduct at the guilt phase of a capital murder trial. In addressing Darden's argument that his trial and resulting conviction were fundamentally unfair because of the prosecutor's improper argument, the Court characterized the inquiry as whether the improper comments were so unfair as to make the conviction a denial of due process. *Darden*, 477 U.S. at 181. The *Darden* Court based its due process standard on *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), another prosecutorial miscon-

duct case. In considering DeChristoforo's claim that his first degree murder conviction violated his due process rights, the Court stated that the due process analysis properly addresses more than just the questionable prosecutorial conduct itself. *Id.* at 639. Instead, a court making a due process inquiry must consider the challenged conduct in relation to the proceeding as a whole. *Id.* The analysis of a due process claim premised on unfair prosecutorial conduct may thus depend upon numerous factors, which include the nature of the prosecutorial misconduct, *Darden*, 477 U.S. at 181-82, the extent of the improper conduct, *DeChristoforo*, 416 U.S. at 645, the issuance of curative instructions from the court, *Darden*, 477 U.S. at 182, any defense conduct inviting the improper prosecutorial response, *id.*, and the weight of the evidence. *Id.*; *see also Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998) (holding that a prosecutorial misconduct determination requires the court to look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the court's charge, and whether the errors were isolated or repeated). Based on this precedent, it is evident that both *Darden* and *DeChristoforo* apply to cases in which the defendant or petitioner alleges that the admission of victim-impact evidence or prosecutorial comment on victim-impact evidence violated his rights under the Due Process Clause of the Fourteenth Amendment.

Under this approach, Humphries's initial hurdle is to demonstrate that the solicitor's year-by-year chronology comments were improper.[2] In this regard, the majority does not posit that any one of the solicitor's comments, standing alone, was improper or factually inaccurate. Rather, according to the majority, the year-by-year chronology comments, collectively, created an impermissible situation in which the solicitor asked for a sentence of death based solely on the relative worth of the lives of Dickie Smith and Humphries.

The fatal flaw in the majority's analysis is that a victim-to-defendant comparative worth argument is not prohibited by Supreme

---

[2]Because the majority does not suggest that the state trial court improperly admitted any victim-impact evidence, I will confine my analysis to the solicitor's comments that the majority concludes violated Humphries's rights under the Due Process Clause of the Fourteenth Amendment.

Court precedent, let alone "clearly established" precedent. For good reason, in fact, even the majority today recognizes that victim-to-defendant comparisons are "inescapable in light of the *Payne* decision." *Ante* at 16.

One of the reasons proffered by the Supreme Court supporting its decision in *Payne* was that the states have a legitimate interest in introducing evidence of a victim's personal characteristics and evidence of the harm caused to the victim's family and society by the defendant's actions to counteract the mitigating evidence presented by a defendant. 501 U.S. at 825. Whether the victim-impact evidence counteracts the defendant's mitigating evidence is a question, asking the jury to make a comparison between the victim-impact evidence and the defendant's mitigating evidence. In this case, in determining the appropriate sentence, the jury was asked to consider Dickie Smith's personal characteristics, the harm caused to his family and society by Humphries's actions, and Humphries's mitigating evidence, which included evidence of Humphries's personal characteristics, both good and bad. Thus, the solicitor's year-by-year chronology comments were within the boundaries of a question the jury was required to consider—the blameworthiness of Humphries.

Of course, allowing the introduction of victim-impact evidence does not, and should not, open the door to evidence/argument ultimately allowing the jury to make a comparative inquiry between the victim and other victims in society, as the Court in *Payne* apparently recognized. *Id.* at 827. A victim-to-victim comparison is certainly more pernicious than a victim-to-defendant comparison because, not only does it invite a commentary on collateral evidence not properly before the jury (the worthiness of other members (victims) of society), it does not counteract the defendant's mitigating evidence, which was one of the main goals of *Payne*.

Put simply, clearly established Supreme Court precedent does not prohibit victim-to-defendant comparisons; they are inevitable in any capital case in which the jury is asked to assess the persuasive force of the defendant's mitigating evidence and the victim-impact evidence. A consequence of *Payne* is that a defendant can be put to death for the murder of a person more "unique" than another, even though the defendant is, in fact, unaware of the victim's uniqueness. This

does give some pause for concern, as does the notion that, under *Payne*, a sentence of death can turn on the severity of the harm caused to the victim's family and society, even though the defendant did not know the victim or the victim's family. However, these are inevitable consequences of the *Payne* framework; a framework that we, as judges of an inferior court, are without liberty to change.

Because Humphries cannot show that the solicitor's comments were improper, my analysis could end right here. However, even if we need to get to the issue of prejudice, it is evident that Humphries was not prejudiced by the solicitor's year-by-year chronology.

In its opinion, the majority posits that, "[g]iven the force" of the solicitor's year-by-year chronology, it is safe to conclude that at least one juror would have struck a different balance between life and death. *Ante* at 15. For this reason, the majority concludes, Humphries was prejudiced by the solicitor's year-by-year chronology.

In my view, the majority's prejudice analysis is flawed in several respects. First, the record in this case simply belies the court's claim that the solicitor's year-by-year chronology was the centerpiece of the solicitor's argument. It was not. As set forth above, the solicitor's year-by-year chronology essentially was the manner in which the solicitor chose to present to the jury the argument that Dickie Smith was a unique individual. Within that year-by-year chronology, the solicitor referenced Humphries four times, telling the jury that: (1) "Dickie Smith is as much about this case as . . . Humphries"; (2) Humphries "committed two house break-ins at age 13"; (3) in 1986 Humphries violated the terms of his probation and was "sent down to Columbia"; and (4) in 1988 Humphries went to prison for two years. The bulk of the solicitor's argument was not, as the majority would have us believe, that Humphries should die because his life was worth less than Dickie Smith's. Indeed, the majority recognizes that the solicitor did not use the words "comparative worth" or "value" in his year-by-year chronology. *Ante* at 6. Rather, the bulk of the solicitor's argument was devoted to the evidence in aggravation, Humphries's lack of character, the absence of mitigating evidence in the case, and an explanation how these facts, along with the victim-impact evidence, warranted the imposition of a sentence of death.

To be sure, the portion of the solicitor's argument dealing with Dickie Smith's unique personal characteristics is contained in less than four pages of an approximately twenty-eight page transcript of the solicitor's closing argument, and, during this segment of the solicitor's closing argument, Humphries is mentioned just four times. Further, after the solicitor made his final reference to Humphries in his year-by-year chronology by telling the jury that in 1988 Humphries "went to jail for two years," the solicitor followed two sentences later with the reminder to the jury that it had "the right to look at the uniqueness of the individual." The solicitor then added that "Dickie Smith, by everybody's description to you was a unique individual." Moreover, the solicitor essentially concluded his argument by asking the jury to impose a sentence of death because: (1) the evidence in aggravation was overwhelming; (2) there was a complete lack of mitigating evidence; (3) Humphries's character was poor; and (4) "somebody like Dickie Smith [was] taken." The solicitor's closing argument, as outlined above, simply did not invite the jury to return a sentence based on the relative worth of the lives of Dickie Smith and Humphries. Rather, the solicitor invited the jury to consider all of the evidence in the record in reaching its verdict. That being the case, it is difficult to see how the solicitor's year-by-year chronology prejudiced Humphries.

Second, the solicitor's comments that the majority finds so objectionable were based upon facts established during the trial and were aspects of the trial which were readily apparent to the jury. Indeed, the circumstances of Dickie Smith's life and the impact of his death on his family were thoroughly presented without contemporaneous objection through the testimony of Randy and Pat Smith. The circumstances of Humphries's upbringing were thoroughly explored by Humphries's counsel in the thirteen witnesses called by the defense. Thus, we are not dealing with a situation where the alleged improper comments mislead the jury into thinking the prosecution obtained extra-judicial information not available to the jury. *Cf. United States v. Moore*, 710 F.2d 157, 159 (4th Cir. 1983) (noting that improper prosecutorial comment might mislead the jury into thinking the prosecution obtained extra-judicial information not available to the jury). Because the solicitor's year-by-year chronology was based on evidence already before the jury, it is hard to say that Humphries was prejudiced by the solicitor's comments.

Third, the facts concerning Humphries referred to by the solicitor in his year-by-year chronology were already thoroughly recounted in greater detail in the portion of the solicitor's closing argument related to Humphries's character. No objection, even to this date, is being raised concerning this portion of the solicitor's closing argument. As noted above, the solicitor's year-by-year chronology contained the following facts relating to Humphries: (1) he "committed two house break-ins at age 13"; (2) in 1986 he violated the terms of his probation and was "sent down to Columbia"; and (3) in 1988 he went to prison for two years. Earlier, however, the solicitor mentioned that Humphries had, at age thirteen, "committed two breaking and enterings" and was placed on probation. The solicitor pointed out that, because Humphries continued to be disobedient in school, he was brought before the family court on a probation violation and was released with stricter conditions imposed. The solicitor added that, at age fifteen, Humphries violated the terms of his probation and was "sent down to Columbia." The solicitor also proffered that, at age sixteen, Humphries was "an habitual truant," who "basically drop[ped] out of school." The solicitor further noted that, at age seventeen, Humphries burglarized a church. The solicitor noted that, at age eighteen, Humphries went to Alabama and committed a larceny for which he was convicted and imprisoned for two years. Finally, the solicitor noted that, upon his release, Humphries failed to report to the probation office, a warrant was issued, and within a couple of years of his release from prison he committed the murder at issue. Because all of the facts referred to by the solicitor in his year-by-year chronology were facts recounted in greater detail earlier in his closing argument, it is difficult to conclude that Humphries was in any way prejudiced by the portion of the solicitor's argument related to the unique character of Dickie Smith.

Finally, the evidence in this case concerning the appropriate sentence was not close. The evidence showed that, after Humphries and Eddie Blackwell entered the Max-Saver convenience store, Dickie Smith asked Humphries whether he wanted something hot, and Humphries flashed a stolen gun and replied that he wanted money. While there was evidence that Dickie Smith reached under a counter to pull out a gun, Humphries shot Dickie Smith in the head, killing him. This evidence clearly supported the aggravating factor in the case, that the murder was committed during the commission of a robbery while

Humphries was armed with a deadly weapon. The evidence in mitigation proffered by Humphries to counteract the evidence in aggravation was carefully and meticulously attacked by the solicitor. Moreover, that Dickie Smith was a unique person is not subject to serious debate. In short, I harbor no doubt that, notwithstanding the solicitor's comments that the majority finds so objectionable, a sentence of death would have resulted.

## VI

One final word concerning the majority's opinion. The majority persuasively explains the dangers inherent in comparative worth arguments and why, in theory, they should be prohibited. If we were free from the constraints of § 2254 and *Payne*, one might agree with much of what the majority has written. Ultimately, however, our standard of review of the South Carolina Supreme Court's decision is narrow. Because the South Carolina Supreme Court identified the correct legal standard from the Supreme Court's decision in *Payne*, Humphries must show that the South Carolina Supreme Court unreasonably applied the *Payne* decision. *Williams v. Taylor*, 529 U.S. at 413. In this case, the South Carolina Supreme Court thoroughly explained why the solicitor's year-by-year chronology was not improper, let alone, prejudicial under *Payne*. The majority today simply cannot explain how the South Carolina Supreme Court unreasonably applied the *Payne* decision and, for this reason, I am constrained to dissent. Accordingly, I would affirm the district court's denial of the writ.